[Cite as *In re E.B.*, 2020-Ohio-4139.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

IN RE E.B., ET AL.

Minor Children

[Appeal by M.E., Mother]

:
:
:
:
:
:

Nos. 109093 and 109094

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** August 20, 2020

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case Nos. AD17909497 and AD17909498

***Appearances:***

Baron Law, L.L.C., and Brittany A. Baron, *for appellant.*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Willie Mitchell, Assistant Prosecuting Attorney, *for appellee* Cuyahoga County Division of Children and Family Services; Marilyn Weinberg and Steven W. Ritz, Assistant Prosecuting Attorneys, *for appellee* Office of Child Support Services.

Vaughn & Associates, L.L.C., and Ann Vaughn, *for appellee* R.B.

EILEEN T. GALLAGHER, A.J.:

**{¶ 1}** Appellant-Mother, M.E. ("Mother"), appeals from the adjudication and disposition of her minor children, E.B. (d.o.b. July 2, 2010) and K.B. (d.o.b. October 7, 2007). She raises the following assignments of error for review:

> 1. The trial court erred and abused its discretion in determining that K.B. was abused.
>
> 2. The trial court erred and abused its discretion in determining that E.B. was dependent.
>
> 3. The trial court erred and abused its discretion in failing to dismiss the complaint filed by the Cuyahoga County Department of Children and Family Services.
>
> 4. The trial court erred and abused its discretion in modifying the terms of the shared-parenting plan rather than granting the agency's dispositional prayer dated December 14, 2018.
>
> 5. The trial court erred and abused its discretion in designating appellee-Father as the residential parent for school purposes.

**{¶ 2}** After careful review of the record and relevant case law, we affirm the juvenile court's judgment.

## I. Procedural and Factual History

**{¶ 3}** Mother and appellee-Father, R.B. ("Father"), were divorced in January 2015. During their marriage, Mother and Father had two children, E.B. and K.B. At the time of their divorce, Mother and Father entered into a shared-parenting plan that provided equal parenting time.

**{¶ 4}** In January 2016, Mother married her current husband, A.O. During their marriage, Mother gave birth to the minor child, Z.E., on November 13, 2016.

{¶ 5} On June 19, 2017, the Cuyahoga County Division of Children and Family Services ("CCDCFS" or the "agency") filed a complaint, seeking temporary custody of the minor children. The complaint alleged K.B. and E.B. to be abused children, and Z.E. to be a dependent child based on the following particulars:

1. Father of Z.E., [A.O.], has engaged in sexualized behaviors with K.B. and E.B. A criminal investigation is currently pending.

2. Mother lacks the appropriate judgment and parenting skills to ensure the safety of the children. Mother continued to allow the stepfather access to the children despite E.B.'s disclosures in October 2016. Mother does not believe the children and has allowed [A.O.] to remain in the home.

3. The severity of the incidents endured by K.B. and E.B. places Z.E. in danger of being abused.

4. Father of K.B. and E.B. * * * has been providing for his children's basic needs since April 2017.

5. Mother and [Father] have a volatile relationship and place children in the middle of their disputes.

{¶ 6} An adjudication hearing was held on August 29, 2017. At the hearing, CCDCFS social worker, Esther Bradley, testified that she was assigned to E.B. and K.B.'s case once the agency was notified of allegations that a child living in Mother's home had been inappropriately touched. At the onset of her investigation, Bradley separately interviewed E.B. and K.B. on March 23, 2017. Bradley testified that "neither girl disclosed any type of inappropriate touching" at that time. Thereafter, Bradley met with Father. During this meeting, Father revealed that in October 2016, he made an audio recording of E.B. verbally disclosing that she had been inappropriately touched by her stepfather, A.O.

{¶ 7} After listening to the audio recording, Bradley "had some concerns," and determined that it was necessary to meet with A.O. to inform him of the allegations levied against him by E.B. Bradley testified that A.O. "completely denied that anything inappropriate had happened." A.O. appeared "very shocked" and "disappointed" by the accusations. At the conclusion of the meeting, Bradley advised A.O. that "either he or the girls would have to leave the home until [her] investigation was complete." Bradley testified that Mother became "extremely irate" when she learned A.O. was asked to leave the household. Ultimately, Mother determined that E.B. and K.B. would stay with Father during the pendency of the investigation.

{¶ 8} Following conversations with police officials and the children's therapists, Bradley interviewed E.B. and K.B. a second time. During these interviews, Bradley learned that A.O. was present during Mother's visits with the children, "despite the safety plan being in place, no contact, no communication." No disclosures of inappropriate touching were made by either child during the second interviews.

{¶ 9} Bradley testified that she later participated in a joint interview of E.B. with Detective Kenneth Vagase of the North Olmsted Police Department. On this occasion, E.B. reported that A.O. had "inappropriately touched her while giving her a shower." E.B. recalled that the incident occurred "around the time that [Mother] was in the hospital giving birth." Based on these allegations, Bradley referred E.B.

to the Cleveland Rape Crisis Center. Bradley testified that Mother "still denied that anything inappropriate happened" and characterized the children as "liars."

{¶ 10} Bradley estimated that she interviewed E.B. on three separate occasions and interviewed K.B. on four separate occasions. Bradley testified that K.B. did not make any disclosures of inappropriate touching during the first and second interviews. However, during the third interview, K.B. reported inappropriate touching. According to Bradley, K.B. expressed that she did not initially disclose the inappropriate touching because she "did not want Z.E. to grow up without a father" if A.O. was required "to go to jail."

{¶ 11} Bradley summarized the children's allegations against A.O. as follows:

> The first involving E.B. is that [A.O.], while showering her, he stuck his finger in what she calls her ginny and told her he needed to get the white stuff out.
>
> * * *
>
> With K.B., while giving her a shower, he touched her on her ta-tas. He rubbed, squeezed, and pinched them and focused just on the right one.
>
> * * *
>
> Both girls disclosed to me that they told their mother and she went to [A.O.] and asked him if he did it. He denied it, and so she did nothing to protect [the children].

{¶ 12} At the time of the adjudication hearing, the police were actively investigating the allegations of sexual abuse. Det. Vagase testified that he became involved in the case after Father filed a police report. Thereafter, Det. Vagase

contacted CCDCFS and scheduled separate interviews with E.B. and K.B. to occur on May 16, 2017. During this initial interview with police officials, E.B. disclosed allegations of sexual abuse against A.O. However, K.B. made no disclosures at that time. Det. Vagase testified that K.B. was interviewed a second time on May 31, 2017. On this occasion, K.B. disclosed that A.O. had inappropriately touched "her breast area." She stated that she did not report the touching during her first interview because "she didn't want her mom to be mad at her."

{¶ 13} Based on the foregoing allegations, a complaint for temporary custody was filed, and a warrant was issued for A.O.'s arrest. In addition, Det. Vagase testified that grand jury proceedings were scheduled to commence in the Cuyahoga County Court of Common Pleas. Det. Vagase testified that Mother was included in the grand jury proceedings based on her actions during the investigation that caused K.B. to develop suicidal thoughts.

{¶ 14} The children's guardian ad litem ("GAL"), Stephanie B. Scalise, testified that she completed an independent investigation in an effort to make a recommendation to the juvenile court about the children's best interests. In the course of her investigation, the GAL met with CCDCFS officials, Father, Mother, and the children. The GAL testified that K.B. disclosed to her that "her stepfather, [A.O.] was showering her and in her words, 'touched her.'" K.B. further expressed that she "thinks about whether or not the world would be a better place without her in it." K.B. stated that she felt this way because Mother "does not believe her" and told the parents of K.B.'s friends that "none of this stuff is true." When the GAL attempted

to question E.B. about her previous disclosures, E.B. stated that she did not wish to discuss the matter.

{¶ 15} The children's psychologist, Tara Reid, testified on behalf of Mother. Reid testified that she began meeting with the children to address concerns with E.B.'s aggressive behavior and "normal childish lying." At some point, Father made Reid aware of the audio recording that captured E.B. disclosing that she had been inappropriately touched by A.O. Although E.B. did not make any disclosures to Reid personally, Reid contacted 6-9-6-KIDS, and "deliberately stayed away from questioning the kids or trying to discuss this material" during the pending investigation. However, Reid did contact the therapist who was treating the children during the time period the audio recording was created. The therapist confirmed that she was made aware of the allegations of inappropriate touching, but that E.B. had "quickly recanted."

{¶ 16} Father testified as if on cross-examination. Father testified that E.B. first disclosed the inappropriate touching to him in October 2016. Father stated that he immediately asked E.B. to repeat herself while he recorded her making the disclosure. When Father brought the recording to Mother's attention, E.B. quickly recanted and claimed that she had lied about the allegations. Father conceded that E.B. has a history of lying and that he previously had "doubts" about whether E.B.'s initial disclosure was true. As a result, he did not go to the police and permitted the children to remain in Mother's household with A.O. Instead, Father determined that the best course of action was to notify the children's psychologist about E.B.'s

allegations. Father testified that the psychologist indicated that she was going to file a report with CCDCFS. However, Father did not follow up with CCDCFS. Once the children switched psychologists and began meeting with Reid, Father notified Reid about E.B.'s prior allegations and provided her with the audio recording in March 2017. Father expressed that as time went on, he came to believe E.B.'s initial disclosure because "she kept saying it was true" and "never changed her story with [him]."

{¶ 17} On October 12, 2017, the magistrate issued a decision adjudicating E.B. and K.B. abused and Z.E. dependent. In its findings of fact and conclusions of law, the magistrate determined that E.B. and K.B. were "victim[s] of 'sexual activity' as defined by [R.C. Chapter] 2907 as [A.O.], Mother's [husband], sexually touched [them] in the home where the Mother, [A.O.]. and the child[ren]'s siblings resided." Accordingly, the magistrate found that returning the children to Mother's home would be contrary to their best interests. E.B. and K.B. were ordered to remain in their current placement with Father.

{¶ 18} On October 20, 2017, Mother filed objections to the magistrate's decision, arguing that (1) the magistrate erred and abused its discretion in determining that E.B. and K.B. were abused, (2) the magistrate erred and abused its discretion in finding that Mother lacks the appropriate judgment and parenting skills to ensure the safety of the children, (3) the magistrate erred and abused its discretion in finding that Mother continued to allow the stepfather access to the children despite E.B.'s disclosures in October 2016, (4) the magistrate erred and

abused its discretion in finding that Z.E. is dependent, and (5) the magistrate erred and abused its discretion in finding that Father has been exclusively providing for E.B. and K.B.'s basic needs since April 2017.

{¶ 19} On December 7, 2017, CCDCFS filed a brief in opposition to Mother's objections to the magistrate's decision, arguing the adjudications were supported by clear and convincing evidence.

{¶ 20} In judgment entries dated January 10, 2018, the juvenile court affirmed, approved, and adopted the magistrate's decision in part. Regarding E.B., the court found that allegation Nos. 3, 4, and 5 of the complaint were proven by clear and convincing evidence. However, allegation Nos. 1 and 2 were dismissed. Thus, contrary to the conclusions of the magistrate, the juvenile court determined that E.B. was a dependent child, but not abused.

{¶ 21} With respect to K.B., the juvenile court found that allegation Nos. 1, 4, and 5 of the complaint were proven by clear and convincing evidence. Allegation Nos. 2 and 3 were dismissed. Thus, the juvenile court determined that K.B. was an abused child. The court agreed that returning E.B. and K.B. to Mother's home was not in their best interests. Accordingly, the children were ordered to remain in their placement with Father pending further hearings.

{¶ 22} On April 30, 2018, Father filed a motion for custody, requesting the juvenile court to award him legal custody of K.B. and E.B. Father alleged that there has been a significant change of circumstances in the lives of the children and

Mother since the parties entered a shared-parenting plan, including the allegations of sexual contact with the children.

{¶ 23} On May 7, 2018, CCDCFS filed a motion requesting the juvenile court to "amend the dispositional prayer for the subject children from temporary custody to [Father], to an order of legal custody to [Father], with no restrictions." The motion, stated, in relevant part:

> On April 26, 2018, the Agency held a staff [meeting] to discuss changing its dispositional request. The children have been living with [Father] for over a year. Father has been involved with the counseling services provided for the children, K.B. and E.B. A grant of legal custody to [Father] is required in the interests of justice, and is in K.B. and E.B.'s best interests.

{¶ 24} The matter proceeded to a dispositional hearing on October 30, 2018. At the hearing, Simon Moldaver, a child protection specialist for CCDCFS, testified on behalf of the agency. Moldaver testified that he was assigned to each child's case in July 2017. He explained that the agency's permanency plan for E.B. and K.B. is "legal custody to the father." Moldaver testified that the agency developed a case plan for Mother, requiring her to "participate in a service that will help her understand the trauma that K.B. and E.B. experienced." Moldaver stated that in October 2017, he spoke to Mother about attending classes at the Rape Crisis Center to learn "to deal with the trauma that the girls had suffered." Mother, however, "declined" to attend the classes, expressing that her participation in the trauma classes would amount to an admission that A.O. had acted inappropriately.

Thereafter, Moldaver referred Mother to the local community collaborative for parenting classes. Again, Mother declined to participate in the service.

{¶ 25} In April 2018, the agency held a meeting with Mother to discuss its intention to amend its dispositional prayer of relief from temporary custody to Father to a request for legal custody of E.B. and K.B. to Father. At that time, Mother agreed to participate in parenting classes. However, Moldaver testified that the agency was unable to "re-engage [Mother] to do the services at the Rape Crisis Center." Moldaver also stated that Mother declined the agency's request to participate in a psychological assessment.

{¶ 26} During his cross-examination, Moldaver reiterated that Mother's case plan required her "to engage in, for lack of a better word, counseling to understand and help assist her daughters with the trauma that they were experiencing." Moldaver conceded that the case plan did not specify the services Mother was required to complete, but expressed that the relevant services were discussed with Mother by agency officials. Despite her failure to participate in certain recommended services, Moldaver confirmed that Mother has actively participated in reunification therapy and has regular parenting time with E.B. and K.B. Beyond ongoing concerns with Mother's "ability or willingness to protect [E.B. and K.B.] going forward," Moldaver stated that there were no concerns with Mother's ability to provide day-to-day care and affection.

{¶ 27} Clinical psychologist, Dr. Mark Lovinger, testified that he was retained as the reunification therapist to assist Mother in resuming her relationship with E.B. and K.B. During the course of his involvement in the case, Dr. Lovinger met with Father and held joint sessions with Mother, E.B., and K.B. Dr. Lovinger testified that the children were happy to spend time with Mother and that there was nothing to indicate "that the children were afraid of their mother." When Father was present during the sessions with the children, "the girls were a bit more reserved." Based on his observations, Dr. Lovinger made recommendations to the GAL to incrementally increase Mother's parenting time. Dr. Lovinger testified that, aside from transportation logistics, Father did not raise any concerns with the children being in Mother's care for additional periods of time. Following the testimony of Dr. Lovinger, the proceedings concluded for the day, and the matter was set to resume on December 17, 2018.

{¶ 28} On December 7, 2018, CCDCFS held a staff meeting "to discuss possibly changing the dispositional request regarding all of the children." Following this staff meeting, CCDCFS filed a motion on December 14, 2018, requesting the juvenile court to amend the dispositional prayer for K.B. and E.B. from legal custody to Father, to an order of legal custody to Mother and Father, with no restrictions. The motion stated that "because K.B. and E.B. have benefited from counseling and their visits with Mother have been positive, it will be in their best interests to be ordered to the legal custody of [Mother] and [Father]."

**{¶ 29}** Following an additional continuance, the dispositional hearing resumed on February 28, 2019. At the onset of the hearing, Mother stated that she was in agreement with the agency's amended dispositional prayer. Father objected to the requested disposition.

**{¶ 30}** Mother was called to testify as if on cross-examination by counsel for Father. Mother testified that she lives with her husband, A.O., and currently visits the children every Tuesday and Thursday for four hours, and has them every other weekend. Mother acknowledged that the children are maintaining acceptable grades in their current school. However, Mother testified that she believes it is in the children's best interests to return to their school in the city of North Olmsted, "because their current curriculum is not keeping them engaged." Regarding her communications with Father, Mother opined that Father has been "unforthcoming" and that "communication is as abysmal now as it was prior to this matter." For instance, Mother testified that the children have been taken to doctor and therapist appointments without her knowledge and consent.

**{¶ 31}** Mother testified that it was her desire to have additional overnight parenting time with the children. When asked whether she believed it was appropriate for A.O. to be present during these overnight visits, Mother responded, "It is not appropriate at this time since we have not completed reunification therapy." Mother testified that if the visitation schedule returned to what it was previously under the shared-parenting order, A.O. would "stay elsewhere" during her parenting time. Mother expressed that it was her belief that "the introduction

of [A.O.] should be made at the behest and direction of the reunification therapist [they] are currently seeing."

{¶ 32} CCDCFS social worker, Simon Moldaver, was recalled by counsel for Father. With respect to the staff meeting held by the agency on December 7, 2018, Moldaver testified that the agency's decision to amend its dispositional prayer in this case was largely predicated on the agency's determination that Z.E. should be returned to the custody of her biological parents. Moldaver explained the implications of Z.E.'s case as follows:

> Once we came to that decision we had somewhat of a conundrum that it was considered safe and appropriate care of Z.E. and had been for a number of months * * * and the agency was in a position of saying that Z.E. was safe in the home and in appropriate care, but if the agency was asking for strictly legal custody to [Father], we would be saying Z.E. is safe but K.B. and E.B. aren't safe in the same home, and that was kind of an [in]consistency.

{¶ 33} Moldaver testified that he no longer has concerns with Mother's parenting capabilities, that Mother's home is appropriate, that Mother has complied with her case plan "to an extent," and that he believed it was in the children's best interests for the children to be in the legal custody of Mother and Father. Moldaver opined that Mother, A.O., and the children should continue to attend reunification therapy, but that the court should ultimately determine whether A.O. may be present during Mother's parenting time.

{¶ 34} The children's GAL testified that despite the agency's amended dispositional prayer, she continued to believe that it was in the children's best

interest "to remain in the legal custody of [Father]," while having parenting time with Mother. The GAL testified that it was her personal opinion that the children's participation in reunification therapy with their alleged sexual abuser was not beneficial to the children. Regarding the children's schooling, the GAL testified that they are "thriving" at their current school and have expressed that they like their school and the new friends they have made. The GAL stated that it could be disruptive for the children to return to their previous school during the academic year. In addition, the GAL noted that it was particularly concerning for K.B. to return to her previous school because her friends in North Olmsted "know about her disclosure of sexual assault" and have "told her, you know, your mom doesn't' believe you — you're a liar."

{¶ 35} Father testified that granting him full legal custody is in the best interests of his children. He stated that E.B. and K.B. are doing well in their new school, are participating in extracurricular activities, and have adjusted to living in his household. Father conceded that the children's overnight visits with Mother were going well and that he has no concerns about Mother and her parenting time with the children. However, he opined that it would not be appropriate to go back to the split parenting time because it was difficult on the children to rotate households on a weekly basis.

{¶ 36} In journal entries dated February 28, 2019, the magistrate issued a decision, committing E.B. and K.B. to "the legal custody of [Mother] and [Father], residing with Father as residential parent for school purposes." The magistrate

determined that it was not in the children's best interests to name Mother as the residential parent for school purposes. Relevant to this appeal, the magistrate further stated in each entry:

> The Mother has declined to participate in counseling for trauma for the child as she didn't believe the child was abused, however, the Mother has participated in reunification therapy with the child. The Mother declined to participate in parenting education through the Community Collaborative as the parenting class that was recommended was not the correct class to address the issues. The Mother declined to participate in a mental health evaluation through the Court Diagnostic Clinic due to privacy concerns. The Mother has been having regular parenting time with the child in her home on Tuesdays and Thursdays from 3:30-7:30 p.m. and alternating weekends from Friday afternoon until Sunday morning. The stepfather [A.O.] is not allowed to be in the home during visitations. The Mother, stepfather [A.O.] and child are currently seeing a counselor for reunification therapy. The Father participated in Trauma Focused counseling, through the Rape Crisis Center, to address the child's trauma.

{¶ 37} On March 14, 2019, Mother filed objections to the magistrate's decision. In relevant part, Mother argued (1) the magistrate erred and abused its discretion by applying R.C. 2151.343 rather than exercise jurisdiction in accordance with R.C. 3109.04, (2) the magistrate erred and abused its discretion by finding that the children's return to Mother's home as residential parent for school purposes was contrary to the children's best interests, and (3) the magistrate erred and abused its discretion in finding that Mother declined to participate in counseling for trauma for the children.

{¶ 38} CCDCFS filed a brief in opposition to Mother's objections, arguing "the magistrate did not abuse its discretion when it designated Father as the residential parent as Mother's home is not a safe environment for K.B. and E.B."

Likewise, the agency asserted that the magistrate did not abuse its discretion in determining that it was not in the children's best interests to name Mother as the children's residential parent.

{¶ 39} On June 7, 2019, Mother filed supplemental objections to the magistrate's decision. In relevant part, Mother argued the magistrate erred and abused its discretion (1) by failing to dismiss the complaint filed by CCDCFS, (2) by failing to grant CCDCFS's dispositional prayer of December 14, 2018, and modifying the terms of the shared-parenting plan of January 21, 2015, (3) by giving the GAL's testimony any weight whatsoever, (4) by finding that Mother failed to comply with the CCDCFS case plan, and (5) by designating Father the residential parent for school purposes.

{¶ 40} In separate journal entries dated September 5, 2019, the juvenile court affirmed, approved, and adopted the magistrate's decision in its entirety. The juvenile court overruled Mother's objections, and committed the children to the legal custody of Mother and Father, with Father designated as the residential parent for school purposes. In addition, the juvenile court ordered that "[A.O.] shall not be present" during Mother's visitation time and further suspended its prior order for reunification therapy "pending a further in camera interview with the Court and [K.B.]." The decision to suspend the reunification efforts was predicated on a motion filed by Father, wherein he expressed that "the reunification therapist's recommendations are in conflict with the child's wishes about reunification with the stepfather who was determined to be the perpetrator of the abuse."

{¶ 41} Mother now appeals the juvenile court's judgment.

## II. Law and Analysis

### A. Abused Child

{¶ 42} In her first assignment of error, Mother argues the juvenile court abused its discretion in determining that K.B. was abused pursuant to R.C. 2151.031(A). Mother contends that (1) CCDCFS did not introduce any medical indicators of child abuse, (2) there was no evidence or testimony presented at trial that established that the minor children suffered any injury, and (3) there was no credible, consistent disclosure of abuse made by K.B. Thus, Mother asserts that CCDCFS "failed to establish, by clear and convincing evidence, that K.B. was abused."

{¶ 43} Ohio's juvenile courts are statutory entities, and they are able to exercise only those powers that the General Assembly confers on them. R.C. Chapter 2151; *In re Z.R.*, 144 Ohio St.3d 380, 2015-Ohio-3306, 44 N.E.3d 239, ¶ 14. As a statutory court, the juvenile court has limited jurisdiction, and it can exercise only the authority conferred upon it by the General Assembly. *See State ex rel. Ramey v. Davis*, 119 Ohio St. 596, 165 N.E. 298 (1929), paragraph four of the syllabus.

{¶ 44} The General Assembly has conferred authority on the juvenile courts to hear complaints alleging that a child is abused, neglected, or dependent. R.C. 2151.23(A)(1). The complaint is "the legal document that sets forth the allegations that form the basis for juvenile court jurisdiction." Juv.R. 2(F). The juvenile court

must base its adjudication on the evidence adduced at the adjudicatory hearing to support the allegations in the complaint. *See In re Hunt*, 46 Ohio St.2d 378, 380, 348 N.E.2d 727 (1976).

{¶ 45} R.C. 2151.35(A) sets forth the applicable evidentiary standard for determining whether children are abused, neglected, or dependent at an adjudicatory hearing. It provides, in relevant part:

> If the court at the adjudicatory hearing finds from clear and convincing evidence that the child is an abused, neglected, or dependent child, the court shall proceed, in accordance with division (B) of this section, to hold a dispositional hearing and hear the evidence as to the proper disposition to be made under section 2151.353 of the Revised Code.

{¶ 46} Clear and convincing evidence is that which "'produce[s] in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established.'" *In re Pieper Children*, 85 Ohio App.3d 318, 326, 619 N.E.2d 1059 (12th Dist.1993), quoting *In re Adoption of Holcomb*, 18 Ohio St.3d 361, 368, 481 N.E.2d 613 (1985). If allegations in the complaint are not proved by clear and convincing evidence at the adjudicatory hearing, the juvenile court must dismiss the complaint. Juv.R. 29(F)(1); R.C. 2151.35(A)(1).

{¶ 47} "When an appellate court examines whether a trial court's judgment is based upon clear and convincing evidence, 'a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof.'" *In re C.O.*, 8th Dist. Cuyahoga Nos. 99334 and 99335, 2013-Ohio-5239, ¶ 30, quoting *State v. Schiebel*, 55 Ohio St.3d 71, 74,

564 N.E.2d 54 (1990). If the trial court's judgment is "supported by some competent, credible evidence going to all the essential elements of the case," a reviewing court may not reverse that judgment. *Schiebel* at 74. Furthermore, "an appellate court should not substitute its judgment for that of the trial court when there exists competent and credible evidence supporting the findings of fact and conclusion of law." *Id.* Moreover, deferring to the trial court on matters of credibility is "crucial" in cases involving children, "where there may be much evident in the parties' demeanor and attitude that does not translate to the record well." *Davis v. Flickinger*, 77 Ohio St.3d 415, 418, 674 N.E.2d 1159 (1997).

{¶ 48} In this case, the agency's complaint alleged that K.B. was an abused child as defined in R.C. 2151.031(A), in part, because "[A.O.] has engaged in sexualized behaviors with K.B. * * *."

{¶ 49} R.C. 2151.031(A) provides, in relevant part:

As used in this chapter, an "abused child" includes any child who:

(A) Is the victim of "sexual activity" as defined under Chapter 2907. of the Revised Code, where such activity would constitute an offense under that chapter, except that the court need not find that any person has been convicted of the offense in order to find that the child is an abused child.

{¶ 50} "Sexual activity" includes both sexual conduct and sexual contact. R.C. 2907.01(C). "'Sexual contact' means any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying

either person." R.C. 2907.01(B). The abuse need not be committed by a parent; neither must a parent be in any way at fault relative to the commission of the abuse. *In re T.C.*, 9th Dist. Wayne Nos. 18AP0021 and 18AP0022, 2018-Ohio-4369, ¶ 18, citing *In re Miles*, 9th Dist. Wayne No. 01CA0054, 2002-Ohio-2438, ¶ 26 (Carr, J., dissenting on other grounds). As the statute makes no reference to parental fault, "'[a]ll that is necessary is that the child be a victim, regardless of who is responsible for the abuse.'" *Id.*, quoting *In re Pitts*, 38 Ohio App.3d 1, 5, 525 N.E.2d 814 (5th Dist.1987).

{¶ 51} In this case, social worker, Esther Bradley provided extensive testimony concerning her investigation into the allegations of inappropriate touching. Bradley testified K.B. was initially reluctant to make any disclosures because she did not want Z.E. to grow up without a father. However, K.B. later disclosed to Bradley that A.O. had inappropriately touched her breasts while giving her a shower. Consistent statements were separately made to Det. Kenneth Vagase and the children's GAL, Stephanie B. Scalise. After careful review of the record, we find the agency presented clear and convincing evidence that K.B. was an abused child pursuant to R.C. 2151.031(A). The activity in question would constitute the offense of gross sexual imposition in violation of R.C. 2907.05(A)(4), which provides:

> [n]o person shall have sexual contact with another, not the spouse of the offender; cause another, not the spouse of the offender, to have sexual contact with the offender; or cause two or more other persons to have sexual contact when * * * [t]he other person, or one of the other

persons, is less than thirteen years of age, whether or not the offender knows the age of that person.

*Id. See also State v. Finklea,* 8th Dist. Cuyahoga No. 100066, 2014-Ohio-1515, ¶ 17 (stating that a purpose of sexual arousal or gratification may be inferred from the type, nature, and circumstances of the contact); *In re C.D.B.*, 4th Dist. Jackson No. 12CA8, 2012-Ohio-4911, ¶ 16 (touching another person's pubic region is strong evidence of a sexual purpose).

{¶ 52} Moreover, contrary to Mother's position on appeal, we find no information in the record to suggest K.B.'s allegations against A.O. lacked credibility. When asked to assess K.B.'s allegations, Bradley testified that she gave substantial weight to "the statistics of when children do disclose sex abuse, that 90 to 98 percent of the time they're telling the truth." While the agency was unable to obtain physical or medical evidence to corroborate K.B.'s statements, the record reflects that K.B. made consistent disclosures to three separate investigating officials. In addition, the agency presented significant testimony regarding the mental and emotional impact the alleged incident has had on K.B., including trouble sleeping and suicidal thoughts. As reflected in Father's motion to stay the reunification therapy sessions, K.B. has not recanted her allegations and continues to express concerns with being in the same household as A.O.

{¶ 53} Based on a review of the evidence, we find the juvenile court's adjudication of K.B. as an abused child was supported by competent and credible evidence. Mother's first assignment of error is overruled.

## B. Dependent Child

{¶ 54} In her second assignment of error, Mother argues the juvenile court abused its discretion in determining that E.B. was a dependent child pursuant to R.C. 2151.04. Relying on the language set forth under R.C. 2151.04(D), Mother contends that the juvenile court's adjudication was not supported by clear and convincing evidence because there was no testimony that "a sibling of the child or any other child who resides in the household has been adjudicated abused, neglected, or dependent before the [instant] complaint was filed."

{¶ 55} In this case, however, the agency's complaint alleged that E.B. was a dependent child pursuant to R.C. 2151.04(C). Thus, Mother's reliance on the requirements of R.C. 2151.04(D) is misplaced.

{¶ 56} Under R.C. 2151.04(C), a "dependent child" means any child "whose condition or environment is such as to warrant the state, in the interests of the child, in assuming the child's guardianship." An adjudication under R.C. 2151.04(C) requires evidence that the parent's conduct is having "an adverse impact upon the child sufficiently to warrant state intervention." *In re Burrell*, 58 Ohio St.2d 37, 39, 388 N.E.2d 738 (1979). "That impact cannot be simply inferred in general, but must be specifically demonstrated in a clear and convincing manner." *Id.* Furthermore, an adverse impact that supports a finding of dependency and the intervention of the state must be more than an "upset" child or a "temporary unhappiness." *In re Holzwart*, 3d Dist. Seneca Nos. 13-04-32, 13-04-33, 13-04-34, and 13-04-40, 2005-Ohio-1602, ¶ 12.

{¶ 57} Having determined that there was clear and convincing evidence supporting the adjudication of K.B. as sexually abused, we find the juvenile court's adjudication of E.B. as dependent pursuant to R.C. 2151.04(C), finding that her environment warranted the state's involvement in her guardianship, was supported by clear and convincing evidence. *See In re Z.A.*, 3d Dist. Hancock Nos. 5-08-37, 5-08-38, 5-08-39, and 5-08-40, 2009-Ohio-996, ¶ 38. Mother refused to believe the children's allegations of inappropriate touching, and in turn, permitted A.O. to live in her household. Thus, the agency presented evidence to suggest that the severity of the incident alleged to have been endured by K.B. placed E.B. in danger of abuse. Weighing the evidence and all reasonable inferences, and considering the credibility of witnesses, we find the agency presented sufficient evidence that E.B. was reasonably at risk of harm to support an adjudication of dependency. Accordingly, we find the juvenile court's adjudication pursuant to R.C. 2151.04(C) was supported by competent and credible evidence.

{¶ 58} Mother's second assignment of error is overruled.

### C. The Agency's Complaint

{¶ 59} In her third assignment of error, Mother argues the juvenile court abused its discretion in failing to dismiss the complaint filed by the CCDCFS. Mother contends that the issues raised during the dispositional hearing were "none other than post-decree custody issues which should be litigated in the domestic relations court subject to the parties' decree of dissolution." Thus, Mother asserts

that the juvenile court should have returned the case to the jurisdiction of the domestic relations court.

{¶ 60} Pursuant to R.C. 2151.35(A)(1), once a juvenile court finds abuse, neglect, or dependency by clear and convincing evidence, it is then required to hold a dispositional hearing to determine the child's placement in protective supervision or temporary custody, to decide any motions for legal custody or permanent custody, or to exercise any of the other options in R.C. 2151.353(A).

{¶ 61} Having determined that the juvenile court's adjudication of E.B. and K.B. was supported by clear and convincing evidence, we find no basis to find the juvenile court erred by issuing a dispositional judgment without dismissing the agency's complaint. In this case, the juvenile court had competing motions for legal custody pending before it, and had ample testimony suggesting that there remained ongoing concerns with the children's ability to safely reside with Mother given the implications of her marriage to A.O. R.C. 2151.353(A)(3). The juvenile court in this case acted within the parameters of the subject matter jurisdiction afforded to it under Chapter 2151 of the Ohio Revised Code.

{¶ 62} Mother's third assignment of error is overruled.

### D. Modification of Shared-Parenting Plan

{¶ 63} In her fourth assignment of error, Mother argues the juvenile court abused its discretion in modifying the terms of the parties' shared-parenting plan. In her fifth assignment of error, Mother argues the juvenile court abused its

discretion in designating Father as the residential parent for school purposes. Collectively, Mother contends that it was not in the children's best interests to designate Father as the residential parent for school purposes. Because these assigned errors raise related issues, we address them together for clarity.

{¶ 64} Pursuant to R.C. 2151.23(A), the juvenile court has jurisdiction to determine the custody of a child alleged to be abused, neglected, or dependent, when that child is not the ward of any court in this state. This jurisdiction includes children subject to a divorce decree granting custody pursuant to R.C. 3109.04. *In re Poling*, 64 Ohio St.3d 211, 215, 594 N.E.2d 589 (1992). When a juvenile court makes a custody determination under R.C. 2151.23 and 2151.353, it must do so in accordance with R.C. 3109.04. *Id.* at paragraph two of the syllabus.

{¶ 65} As stated, Mother and Father were divorced and awarded shared-parenting of E.B. and K.B. pursuant to a divorce decree entered in January 2015. Under the terms of the parties' shared-parenting plan, "Mother and Father exercised 50/50 parenting time with one week on, one week off rotation." In this case, the juvenile court's order of disposition modified the shared-parenting plan by (1) designating Father as the "residential parent for school purposes," and (2) limiting Mother's parenting time to "every Tuesday and Thursday from 3:30 p.m. until 7:30 p.m. and alternating weekends from Friday afternoon until Sunday morning." The court's judgment entry expressed that it was not in the children's best interests to designate Mother as the residential parent for school purposes.

{¶ 66} "Once a shared-parenting decree has issued," R.C. 3109.04(E) governs the process of modifying the terms of the shared-parenting decree or the shared-parenting plan. *Fisher v. Hasenjager*, 116 Ohio St.3d 53, 2007-Ohio-5589, 876 N.E.2d 546, ¶ 11. Under Ohio's "custody statute, a [shared-parenting] 'plan' is statutorily different from a [shared-parenting] 'decree' * * *." *Id.* at ¶ 29.

{¶ 67} On appeal, Mother argues the juvenile court's order of disposition amounted to a modification that could only be effectuated by the juvenile court if it complied with the requirements of R.C. 3109.04(E)(1)(a).

{¶ 68} R.C. 3109.04(E)(1)(a) provides for the modification of parental rights and responsibilities in a decree, including the designation of the residential parent and legal custodian. "Typically, this arises when a parent wishes to change legal custody or become the sole residential parent and legal custodian rather than sharing custody." *Gessner v. Gessner*, 2d Dist. Miami No. 2017-CA-6, 2017-Ohio-7514, ¶ 36. In interpreting this section, the Ohio Supreme Court has explained that the requirements of R.C. 3109.04(E)(1)(a) are controlling "when a court modifies an order designating the residential parent and legal custodian." *Fisher* at ¶ 26.

{¶ 69} R.C. 3109.04(E)(1)(a) provides, in relevant part:

> The court shall not modify a prior decree allocating parental rights and responsibilities for the care of children unless it finds, based on facts that have arisen since the prior decree or that were unknown to the court at the time of the prior decree, that a change has occurred in the circumstances of the child, the child's residential parent, or either of the parents subject to a shared-parenting decree, and that the modification is necessary to serve the best interest of the child. In applying these standards, the court shall retain the residential parent

designated by the prior decree or the prior shared-parenting decree, unless a modification is in the best interest of the child and one of the following applies:

* * *

(iii) The harm likely to be caused by a change of environment is outweighed by the advantages of the change of environment to the child.

{¶ 70} Thus, before a juvenile court can modify the allocation of parental rights and responsibilities, it must find (1) that a change in circumstances has occurred since the last decree, (2) that modification is necessary to serve the best interest of the child, and (3) that the advantages of modification outweigh the potential harm. *In re F.T.*, 8th Dist. Cuyahoga Nos. 108934 and 108935, 2020-Ohio-1624, ¶ 49. Here, Mother contends the juvenile court failed to comply with the statute because "there was no finding of a change of circumstances warranting a modification of the parties' shared-parenting plan, nor would a modification be in the best interests of the minor children herein."

{¶ 71} While R.C. 3109.04(E)(1)(a) applies to the modification of an order designating the residential parent and legal custodian, R.C. 3109.04(E)(2) applies to the modification to the terms of a shared-parenting plan. R.C. 3109.04(E)(2)(b) provides:

The court may modify the terms of the plan for shared-parenting approved by the court and incorporated by it into the shared-parenting decree upon its own motion at any time if the court determines that the modifications are in the best interest of the children or upon the request of one or both of the parents under the decree. Modifications under this division may be made at any time. The court shall not make any

modification to the plan under this division, unless the modification is in the best interest of the children.

{¶ 72} The Ohio Supreme Court explained in *Fisher* that R.C. 3109.04(E)(1)(a) and 3109.04(E)(2)(b) contain "significantly different standards for modification." *Id.,* 116 Ohio St.3d 53, 2007-Ohio-5589, 876 N.E.2d 546, at ¶ 33. This is because the General Assembly intended the standard under R.C. 3109.04(E)(1)(a) to be "a high standard" because it was attempting to "spare children from a constant tug of war between their parents who would file a motion for change of custody each time the parent out of custody thought he or she could provide the child a 'better' environment." *Id.* at ¶ 34.

{¶ 73} "Conversely, R.C. 3109.04(E)(2)(b) requires only that the modification of the shared-parenting plan be in the best interest of the child." *Id.* Regarding the standard set forth in R.C. 3109.04(E)(2)(b), the Ohio Supreme Court explained:

> The standard in R.C. 3109.04(E)(2)(b) for modification of a shared-parenting plan is lower because the factors contained in a shared-parenting plan are not as critical to the life of a child as the designation of the child's residential parent and legal custodian. The individual or individuals designated the residential parent and legal custodian of a child will have far greater influence over the child's life than decisions as to which school the child will attend or the physical location of the child during holidays. Further, factors such as the physical location of a child during a particular weekend or holiday or provisions of a child's medical care are more likely to require change over time than the status of the child's residential parent and legal custodian.

*Id.* at ¶ 36.

{¶ 74} Relevant to the specific modifications made by the juvenile court in this case, this court has determined that "the lower standard under R.C. 3109.04(E)(2)(b) applies when a court only modifies the shared-parenting decree to name the residential parent and legal custodian for school purposes." *In re F.T.*, 8th Dist. Cuyahoga Nos. 108934 and 108935, 2020-Ohio-1624, at ¶ 58, citing *Palichat v. Palichat*, 2019-Ohio-1379, 135 N.E.3d 389, ¶ 14 (2d Dist.), citing *Gessner*, 2d Dist. Miami No. 2017-CA-6, 2017-Ohio-7514, at ¶ 35 ("[P]arenting time, child support, and the designation of residential parent for school purposes have all been held to be terms of a shared-parenting plan that only require a 'best interest' evaluation for modification."); *In re O.M.R.*, 11th Dist. Trumbull No. 2013-T-0057, 2014-Ohio-4739, ¶ 9 ("R.C. 3109.04(E)(2)(b) controls modifications of a shared-parenting plan that change or designate a residential parent for school purposes. * * * This is because such a designation "does not affect the legal rights of either parent nor does it involve a reallocation of parental rights."); *Fritsch v. Fritsch*, 1st Dist. Hamilton No. C-140163, 2014-Ohio-5357, ¶ 20-21 (the trial court properly applied the best interest test in R.C. 3109.04(E)(2)(b) "to modify the designation of the residential parent for school purposes"); *Ralston v. Ralston*, 3d Dist. Marion No. 9-08-30, 2009-Ohio-679, ¶ 17 (where trial court retained both parents as residential parents and only modified the designation of residential parenting as it applied to "school purposes," trial court was required to apply R.C. 3109.04(E)(2)(b) rather than 3109.04(E)(1)(a)); and *In re E.L.C.*, 12th Dist. Butler No. CA2014-09-177, 2015-

Ohio-2220, ¶ 42-45 (modification of residential parent for school purposes is evaluated only under "best interest" test).

{¶ 75} Consistent with this court's decision in *In re F.T.*, we conclude that by designating Father as the children's residential parent for school purposes, the juvenile court merely modified a term of the parties' shared-parenting plan that had been incorporated into the parties' divorce decree. In this case, there is no language in the juvenile court's judgment entry to suggest the court modified the divorce decree's allocation of shared parental rights and responsibilities. While maintaining the award of legal custody of the children to both Mother and Father, the juvenile court's judgment merely changed the residential parent for school purposes and modified the parties' parenting time schedule. Our determination that the juvenile court did not modify the divorce decree's designation of the residential parent and legal custodian is consistent with the language of R.C. 3109.04(L)(6)-(7), which states:

> (6) Unless the context clearly requires otherwise and except as otherwise provided in the order, if an order is issued by a court pursuant to this section and the order provides for shared-parenting of a child, each parent, regardless of where the child is physically located or with whom the child is residing at a particular point in time, as specified in the order, is the "residential parent," the "residential parent and legal custodian," or the "custodial parent" of the child.
>
> (7) Unless the context clearly requires otherwise and except as otherwise provided in the order, *a designation in the order of a parent as the residential parent for the purpose of determining the school the child attends * * * does not affect the designation pursuant to division (L)(6) of this section of each parent as the "residential parent," the "residential parent and legal custodian," or the "custodial parent" of the child.*

(Emphasis added.)

{¶ 76} Based on the foregoing, we find the juvenile court was not required to find that a change in circumstances of the child or either parent had occurred at some point after the prior shared-parenting decree was issued before modifying this term of the parties' shared-parenting plan. Rather, the lower standard under R.C. 3109.04(E)(2)(b) applies in this case. Therefore, the juvenile court only had to determine what was in the best interest of the children under R.C. 3109.04(F)(1).

{¶ 77} R.C. 3109.04(F)(1) provides:

In determining the best interest of a child pursuant to this section, whether on an original decree allocating parental rights and responsibilities for the care of children or a modification of a decree allocating those rights and responsibilities, the court shall consider all relevant factors, including, but not limited to:

(a) The wishes of the child's parents regarding the child's care;

(b) If the court has interviewed the child in chambers pursuant to division (B) of this section regarding the child's wishes and concerns as to the allocation of parental rights and responsibilities concerning the child, the wishes and concerns of the child, as expressed to the court;

(c) The child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest;

(d) The child's adjustment to the child's home, school, and community;

(e) The mental and physical health of all persons involved in the situation;

(f) The parent more likely to honor and facilitate court-approved parenting time rights or visitation and companionship rights;

(g) Whether either parent has failed to make all child support payments, including all arrearages, that are required of that parent pursuant to a child support order under which that parent is an obligor;

(h) Whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to any criminal offense involving any act that resulted in a child being an abused child or a neglected child; whether either parent, in a case in which a child has been adjudicated an abused child or a neglected child, previously has been determined to be the perpetrator of the abusive or neglectful act that is the basis of an adjudication; whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to a violation of section 2919.25 of the Revised Code or a sexually oriented offense involving a victim who at the time of the commission of the offense was a member of the family or household that is the subject of the current proceeding; whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to any offense involving a victim who at the time of the commission of the offense was a member of the family or household that is the subject of the current proceeding and caused physical harm to the victim in the commission of the offense; and whether there is reason to believe that either parent has acted in a manner resulting in a child being an abused child or a neglected child;

(i) Whether the residential parent or one of the parents subject to a shared-parenting decree has continuously and willfully denied the other parent's right to parenting time in accordance with an order of the court;

(j) Whether either parent has established a residence, or is planning to establish a residence, outside this state.

{¶ 78} Although a trial court is required to consider the factors set forth in R.C. 3109.04(F), it retains broad discretion in making a best-interest determination. *In re E.O.T.,* 8th Dist. Cuyahoga No. 107328, 2019-Ohio-352, ¶ 39. We therefore will not disturb the juvenile court's judgment absent an abuse of discretion. *Id.*; *In re J.W.,* 8th Dist. Cuyahoga No. 105337, 2017-Ohio-8486, ¶ 19 ("[A] trial court's judgment regarding the allocation of parental rights and responsibilities will not be

disturbed absent an abuse of discretion."). Abuse of discretion is a term used to indicate that a trial court's decision is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

{¶ 79} After careful consideration, we do not find the juvenile court abused its discretion in designating Father as the residential parent for school purposes. Regarding the children's interaction and interrelationships with their parents, the testimony adduced at the dispositional trial demonstrates that Mother and Father each share loving and attentive relationships with E.B. and K.B. Thus, this court does not dispute Mother's ability to provide the children day-to-day care and affection. Nevertheless, in the interest of protecting the children's mental and physical health, we find the record supports the juvenile court's determination that the designation of Mother as the residential parent for school purposes was not in the children's best interests.

{¶ 80} In this case, the children were placed with Father during the pendency of the adjudication and disposition proceedings. CCDCFS social worker, Simon Moldaver, testified that Father provided the children with a safe environment during the duration of the court proceedings. During this extensive time period, the children have excelled in their new school district and have developed positive relationships in their community. Regarding the best interests of the children, the GAL testified as follows:

> What I will say is that they're thriving [at their new school]. There [sic] grades are good. I have reviewed all their report cards that have been

sent to me, and I've also spoken with the Principal there twice and both times I've been told that they're adjusting well.

When I asked them if they like their school, they say yes. They say that they like the new friends that they've made there, and so I don't think that it's negative that they're going there.

The GAL further expressed concerns with returning K.B. to a school district where her friends "know way too many details" about "her disclosure of sexual assault," and have stated to K.B. "you know, your mom doesn't believe you[,] you're a liar."

{¶ 81} In contrast to the children's positive adjustment to Father's home, the record supports the juvenile court's determination that there remain ongoing concerns with Mother's home. At the time the dispositional order was issued, Mother was still participating in reunification therapy with her children and A.O. However, given the allegations of inappropriate touching levied against A.O. by the children, A.O. is not permitted to be present during Mother's parenting time with the children. Regarding this issue, Mother testified that A.O. continues to live in her household. Yet, she conceded that it was premature to allow the children into her household while A.O. is present, and that "the introduction of [A.O.] should be made at the behest and direction of the reunification therapist [they] are currently seeing." Moldaver shared Mother's position and opined that the reunification counseling needed to be completed "prior to the stepfather [A.O.] being in the home with the children." Moldaver expressed that "the trauma that particularly K.B. experienced" would be "enhanced" if the children were prematurely placed in the home where A.O. resides. Thus, at the time the dispositional order was entered, there remained

concerns with placing the children in Mother's care for the purposes of attending school in North Olmsted.

{¶ 82} While Mother is currently able to facilitate her weekday and weekend visits without A.O. being present in the home, such an arrangement is not feasible on a consistent basis for school purposes until further steps are taken with reunification. On this record, however, it appears these efforts have been further delayed, as reflected in the court's decision to stay the reunification therapy sessions based on Father's allegations that "the reunification therapist's recommendations are in conflict with the child's wishes about reunification with the stepfather who was determined to be the perpetrator of the abuse."

{¶ 83} Under the totality of these circumstances, we agree with the court's conclusion that it was not in the children's best interests to be placed in Mother's household for the purposes of school until further advancements are made with the reunification therapist. Accordingly, we find the juvenile court did not abuse its discretion by modifying the shared-parenting plan to name Father the residential parent of the children for school purposes.

{¶ 84} Mother's fourth and fifth assignments of error are overruled.

{¶ 85} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court, juvenile division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN T. GALLAGHER, ADMINISTRATIVE JUDGE

LARRY A. JONES, SR., J., CONCURS;
KATHLEEN ANN KEOUGH, J., DISSENTS WITH SEPARATE ATTACHED OPINION

KATHLEEN ANN KEOUGH, J., DISSENTING:

{¶ 86} I respectfully dissent from the majority's finding that competent and credible evidence was presented supporting the trial court's decision finding K.B. abused and E.B. dependent.

{¶ 87} As the majority recognized, to find a child abused, the court must find by clear and convincing evidence that K.B. was the victim of sexual activity where such activity would constitute an offense under Chapter 2907. In this case, the allegation was A.O.'s touching of K.B.'s breasts while giving her a shower. The majority determines that this touching would constitute the offense of gross sexual imposition. The offense of gross sexual imposition requires the person to "have sexual contact with another." I agree that touching of another's breasts could qualify as sexual contact. However, sexual contact also requires in addition to the touching, there must be the element of purpose — "for the purpose of sexual arousing or

gratifying either person." R.C. 2907.01(B). Only then would the touching qualify as sexual contact.

{¶ 88} As the majority cites, purpose of sexual arousal or gratification may be inferred from the circumstances of the contact. However, courts can only make this inference when there is no innocent, i.e., nonsexual, explanation for the offender's conduct. *See State v. Wilson*, 192 Ohio App.3d 189, 2011-Ohio-155, 948 N.E.2d 515, ¶ 47 (11th Dist.); *State v. Long*, 12th Dist. Warren No. CA2019-08-078, 2020-Ohio-2678, ¶ 26; *State v. Raver*, 10th Dist. Franklin No. 02AP-604, 2003-Ohio-958, ¶ 22 (innocent, nonsexual explanation could be a medical necessity, or that the touching was part of some innocent parental activity such as dressing or bathing the child).

{¶ 89} In this case, Bradley testified that K.B. reported to her that A.O. touched her breasts — "[h]e rubbed, squeezed, and pinched them then focused on just the right one" while he was giving her a shower. (Tr. 58.) According to Bradley, A.O. was supposed to be helping K.B. wash her hair. According to Scalise, K.B. only reported that A.O. inappropriately touched her while showering; she supplied no other details.

{¶ 90} Although I recognize that the reported touching may be beyond mere incidental touching, the conduct occurred during the parental activity of bathing. *Compare Wilson* (offender created a peephole in the shower); and *Long* (touching of the child's erogenous zones in the secrecy of the bedroom and under the blankets). There was no corresponding allegation that A.O. told K.B. not to tell anyone or that

A.O. engaged in other type of activity at the time where an inference could be made that A.O.'s touching, if true, was for the purposes of sexual arousal or gratification.

{¶ 91} Accordingly, based on the lack of evidence demonstrating that A.O.'s actions, if true, were for sexual arousal or gratification purposes, it is my opinion that the trial court's finding that K.B. was abused is not supported by competent and credible evidence. Because this abuse finding necessarily caused the court to find E.B. dependent, I would find that the dependent finding was also unsupported by competent and credible evidence.

{¶ 92} Even assuming that the nature or circumstances of touching K.B.'s breasts was supported by the evidence to create an inference of sexual arousal or gratification; I would still find the trial court's decision unsupported by the evidence. Although I agree that the allegations are serious, my review of the record reveals that the evidence simply did not rise to the level to declare the children abused or dependent. In my opinion, inconsistent and contradictory testimony and evidence was presented about the children's allegations.

{¶ 93} Neither E.B. nor K.B. testified during the adjudication hearing. Accordingly, the trial court considered the credibility of the children and the allegations through the testimony of other witnesses, including their own father who testified that he did not believe E.B. at first because she has a history of lying. According to Bradley, even K.B. told her that she knew E.B. was lying because of E.B.'s "facial expressions." Testimony was given that the children did not initially disclose the alleged touching to multiple individuals or that they denied when

questioned about any inappropriate behaviors. Witnesses testified at the hearing that when the E.B. made the disclosure, she recanted at times. Moreover, K.B. denied that any inappropriate behavior occurred to at least three different individuals on multiple occasions until finally making the disclosure in May 2017 when the investigation surrounding E.B.'s allegations was statutorily required to conclude. In these situations, interviewing the children would have been beneficial to assess their credibility, rather than hearing it secondhand through witnesses.

{¶ 94} Father testified that he knew of the allegations made by E.B. as early as October 2016 and made mother aware of those allegations. Father testified that E.B. had a history of lying, including lying about another sexual activity that purportedly occurred at school. Accordingly, he said he did not believe her and when mother and father confronted E.B. about the allegation, she recanted her allegation. Only upon repeated questioning by father did E.B. then state that she was not lying, that the touching actually occurred. Despite this disclosure, Father did not notify police, suspend any visitation with mother and A.O., or move the domestic relations court to modify the shared-parenting plan. If Father genuinely believed E.B.'s allegations, I find it difficult to comprehend that Father would not take appropriate actions to protect his children.

{¶ 95} The timing of the alleged incidents is also problematic. Father created the audio-only video in October 2016. However, according to witnesses, E.B. said that the inappropriate touching occurred when mother was giving birth to Z.E., which was in November 2016. The trial court "recognized" that E.B.'s age may

inhibit her from not being able to fully associate correct dates with events. However, the testimony from Father was unwavering that E.B.'s story never changed. Moreover, no testimony was presented that would indicate that E.B. had difficulty in remembering dates or times. Finally, K.B. never gave any definitive time when this alleged touching occurred. Again, I believe the best source of viewing credibility of the children would be having the children testify or at least conduct an in camera interview.

{¶ 96} Moreover, I find it troubling that during the time of the hearing, the investigation and criminal charges filed against A.O. were still pending. During the hearing, Detective Vargas placed much emphasis on the fact that he would be presenting the case to the grand jury and hinted that charges against mother were also possible. I take judicial notice that the charges against A.O. were dismissed conveniently on the same day the magistrate issued her decision.

{¶ 97} Again, I agree that the allegations are serious, but my review of the record reveals that evidence simply did not rise to the level to declare the children abused or dependent. Whether or not the children should reside with their mother or father based on the allegations, history, and issues presented in this case, in my opinion, should be addressed in the domestic relations division.

{¶ 98} Accordingly, I would reverse the trial court's decision and remand for dismissal of the complaints.