[Cite as *In re E.V.*, 2025-Ohio-1728.]

# COURT OF APPEALS OF OHIO

# EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

IN RE E.V.

A Minor Child

[Appeal by T.C., Mother]

:
:
:
:
:
:

No. 113910

---

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED IN PART, REVERSED IN PART,
VACATED IN PART, AND REMANDED
**RELEASED AND JOURNALIZED:** May 15, 2025

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case Nos. AD24901081

---

### *Appearances:*

Jessica A. L. Camargo, *for appellant*.

Michael C. O'Malley, Cuyahoga County Prosecuting
Attorney, and Joseph C. Young, Assistant Prosecuting
Attorney, *for appellee*.

DEENA R. CALABRESE, J.:

{¶ 1} Appellant T.C. ("mother") appeals the judgments of the Cuyahoga
County Court of Common Pleas, Juvenile Division ("juvenile court"), which found
mother in direct contempt of court "pursuant to R.C. 2705.01" and sentenced her to
incarceration, adjudicated E.V. to be a neglected child, and granted temporary
custody of E.V. to the appellee Cuyahoga County Division of Children and Family

Services ("CCDCFS" or "the agency"). For the reasons that follow, we reverse the juvenile court's judgment of contempt, vacate mother's unconditional term of confinement, affirm the judgment entries as to neglect and temporary custody, and remand the case for further proceedings consistent with this opinion.

## I. Facts and Procedural History

### A. Initial Proceedings

{¶ 2} In October or November 2023, CCDCFS received a call alerting it to suspicions of educational neglect concerning one of mother's children, E.V., a high-school-aged child. According to the testimony of agency caseworker Gretchen Deininger, discussed more fully below, attempts to engage with mother, as well as with father, T.V. ("father"), to advance the investigation were unsuccessful. CCDCFS filed a complaint on February 5, 2024, alleging that E.V. was neglected as defined in R.C. 2151.03(A)(3) and requesting a disposition of temporary custody to CCDCFS.

{¶ 3} The case proceeded to hearing on February 21, 2024, where the juvenile court granted CCDCFS's request for predispositional temporary custody. No transcript of that proceeding has been made part of the record. According to later entries in the record and transcripts of subsequent hearings, however, mother was present for the February 21, 2024 hearing and was made aware that the juvenile court had ordered E.V. placed into the agency's custody. She nevertheless failed to surrender E.V. to the agency. It was later revealed that the day before the hearing, she had transported E.V. to his maternal grandmother's house in Orville, Ohio, and that grandmother had taken E.V. to West Virginia.

**{¶ 4}** At a March 7, 2024 pretrial, mother was again present. Once again, no transcript of that proceeding has been made part of the record. According to the magistrate's remarks at a subsequent hearing held March 22, 2024, however, mother indicated to the juvenile court on March 7 that she had played an active role in secreting E.V. from the agency. The magistrate informed her that she needed to locate E.V., turn him over to the agency, or face a finding of contempt for violation of a court order.[1] At the same March 7 pretrial, the juvenile court ordered the agency to notify it if E.V. had not been relinquished to their custody.

**{¶ 5}** On March 15, 2024, CCDCFS filed a formal notice, "pursuant to the Court's instruction on March 7, 2024, that mother has not turned the child over to the Agency and the child still has not been located." Later the same day, March 15, the magistrate issued a show-cause order. The order indicated that "Mother had been ordered to turn the child over to [CCDCFS]" and "[t]he Court has been notified that the child has not been turned over to the agency." Mother was ordered to "appear on March 22, 2024 at 9:00 a.m. and show cause why she should not be found to be in contempt of court. If found to be in contempt of court[,] mother will

---

[1] As noted, the transcripts of the February 21, 2024 and March 7, 2024 proceedings were not made part of the record. The facts relating to warnings issued by the juvenile court magistrate are drawn from the magistrate's comments at the March 22, 2024 contempt hearing and corresponding journal entries. The transcript of that hearing, as well as the journal entries, were included in the record on appeal. More importantly, the facts — at least as they pertain to the magistrate's warnings — appear to be unchallenged. And most importantly, given our ultimate disposition of the contempt issue, we see no need to order further supplementation of the record.

be subjected to a jail sentence and/or fine pursuant to statute." The show-cause order contains no explicit purge conditions.

{¶ 6} On March 16, 2024, mother, through counsel, moved for a continuance of the March 22 hearing due to counsel's conflict. The magistrate denied the motion by order dated March 18, 2024, this time hinting at purge conditions. The order stated:

> Good cause is not shown for this motion. The safety and bests interests of the child are not served by delaying the instant hearing. Child's whereabouts remain unknown despite mother being ordered to relinquish custody of the child to [CCDCFS].

> If child is relinquished to the custody of [CCDCFS] prior to March 22, 2024, the Court may revisit this . . . motion.

{¶ 7} Prior to the March 22, 2024 hearing, mother filed two additional pleadings pertinent to the contempt issue. On March 18, she filed her brief in opposition to the motion to show cause, attaching several emails and principally arguing that mother had actually been cooperative in assisting the agency with locating E.V. Mother emphasized that E.V. was not in her physical custody, that his grandmother did not appear to be cooperating, and that E.V. himself (a teenager) may be hiding from CCDCFS. On March 19, she moved to set aside the magistrate's order scheduling the hearing and to continue the March 22 hearing or to hold it earlier in the morning via Zoom video conference. In addition to raising arguments concerning counsel conflicts, mother contended her due-process rights would be violated if the show-cause hearing proceeded on March 22. The juvenile court denied the motion on March 21, 2024.

## B. March 22, 2024 Contempt Hearing

**{¶ 8}** The contempt hearing went forward as scheduled on March 22, 2024. Mother's substitute counsel appeared at the hearing. Mother did not. The magistrate took testimony from agency caseworker Deininger, who detailed the background of the allegations of neglect, indicating she had learned that E.V. had attended Berea schools for at most a single day and then North Olmsted schools for a single day, and that he had been expelled on the very first day for failing to turn over a vape pen. Deininger further testified that she was unable to locate E.V. after the emergency-custody hearing, and was told by mother, in court, that she had taken him to his grandmother's house out of town "the day before the Emergency Custody Hearing." (Mar. 22, 2024 tr. 13.)[2] According to Deininger, mother subsequently told her that the grandmother had taken E.V. to West Virginia.

**{¶ 9}** Deininger testified that after she obtained the grandmother's address in Orville, Ohio, sheriffs were dispatched to the grandmother's house but failed to locate E.V. Deininger filed a missing person's report. She phoned the grandmother, who "basically just screamed at [her] the whole time that the kid's not there" and that the grandmother "doesn't know where he is." (Mar. 22, 2024 tr. 13.) The grandmother purportedly said "that the last time he was there was the day before the Emergency Custody hearing." (Mar. 22, 2024 tr. 14.)

[2] Three transcripts were made part of the record in this appeal. The March 22, 2024 contempt-hearing transcript will be cited as "(Mar. 22, 2024 tr. ___.)" The April 25, 2024 adjudicatory-hearing transcript will be cited as "(Adjudication tr. ___.)" The April 25, 2024 dispositional-hearing and contempt-sentencing transcript will be cited as "(Disposition/Contempt tr. ___.)"

{¶ 10} Deininger testified that while mother said she would provide E.V. with a phone and gave Deininger the number, calls went straight to voicemail. Mother sent Deininger an email indicating (per Deininger's testimony) that E.V. "is scared, that he's not gonna come home until he's back in mother's custody, and that he doesn't want to be in Cuyahoga County Custody." (Mar. 22, 2024 tr. 14.) Mother purportedly refused an in-home visit on the advice of counsel but later told Deininger that per a conversation the grandmother had with E.V., he was living with a new girlfriend.

{¶ 11} In addition to filing a missing person's report, Deininger searched the National Center for Missing and Exploited Children database. The search was unproductive. Deininger testified that despite the February 21, 2024 emergency custody order, mother had not relinquished E.V. into agency custody. She confirmed that mother had been present for an earlier pretrial hearing where the agency had been ordered to notify the juvenile court if E.V. had not been produced. Asked again if mother produced E.V. after that hearing, Deininger responded, "No." (Mar. 22, 2024 tr. 16.)[3]

{¶ 12} The magistrate found mother in contempt of court, remarking that "[i]t's not like he lives in Orville. She took him in [sic] Orville once she got notice of

---

[3] The guardian ad litem ("GAL") was present for the March 22, 2024 hearing and remarked that he had spoken briefly on the phone with someone who identified himself as E.V., but the GAL was not sure it was actually E.V. The person he spoke to, however, sounded "very scared." (Mar. 22, 2024 tr. 23.) The GAL also referenced mother's emails, indicating it "seems like she's trying to cooperate through the emails." (Mar. 22, 2024 tr. 34.)

the Emergency Custody Hearing. She said that here in Court." (Mar. 22, 2024 tr. 34.) When mother's counsel suggested that E.V. was responsible for his own whereabouts, the magistrate remarked: "The child didn't drive himself to Orville. He didn't get on a bus. He didn't get on a plane. His mother, who had custody of him, took him there." (Mar. 22, 2024 tr. 38-39.) The magistrate indicated that "[a] warrant will issue for her arrest" and "[s]he needs to turn that child over." The magistrate specified an explicit purge condition: "[T]he purge is she just has to turn the child over to the Agency." (Mar. 22, 2024 tr. 40.) The magistrate did not mention a jail sentence or fine and did not mention holding mother in contempt for failure to appear at the March 22, 2024 hearing.

{¶ 13} The magistrate filed a journal entry of decision March 22, 2024. The decision contained detailed findings with respect to mother's involvement in secreting E.V. from the agency:

> The Agency has not been able to locate the child and has filed a missing person's report. The mother sought the assistance of the maternal grandmother to assist in hiding the child. Mother by her own admission drove the child to the grandmother in Orville, Ohio. Mother told worker that maternal grandmother and child were in West Virginia and gave the worker a false phone number for grandmother. Mother also advised worker that they were unable to locate child's phone when she initially took child to Orville but was taking it to him when it was found. Mother subsequently stated grandmother and child were back in Orville, Mother ultimately gave the child his phone, after the child was ordered into agency custody but did not relinquish child to agency custody. Mother and grandmother then stated the child is not AWOL and they don't know where he is. Worker has attempted to contact the child on his phone, but it goes to voicemail. Worker, not mother or grandmother, has filed a missing person's report has also contacted the Center for Exploited and Missing Children without success. GAL spoke to the child on one occasion after Emergency Custody was granted

when grandmother contacted GAL and stated child was there with her in that moment. Mother then advised worker that the grandmother had been in contact with the child and child has a new girlfriend named [B.] and he is staying with her. The child has not been attending school and has a pending delinquency case. Mother has been consistently advised that she could be found in direct contempt of this Court's order for purposely failing to relinquish the child to the custody of the Agency pursuant to a Direct Court order.

Mother acting in concert with the maternal grandmother has acted in direct contravention of this Court's orders.

Mother is found to be in direct contempt of this Court's order of February 21, 2024.

The order indicated mother was to be arrested, but specified the purge condition discussed by the magistrate at the conclusion of the hearing: "If mother relinquishes the child to the agency's custody the warrant will be recalled." *Id.* A further, nearly identical entry was docketed March 26, 2024. Neither entry specifies a jail sentence or fine.

{¶ 14} On April 3, 2024, the magistrate issued an order captioned "failure to appear warrant." The entry begins with a notation that the case had been called for hearing on March 22, 2024, "and a warrant was issued" for mother "for failure to appear for the Contempt of Court hearing." That terse introductory procedural history, however, is not borne out by the transcript of the March 22, 2024 hearing or the subsequent orders of March 22 and 26, 2024, which focused on mother's alleged contempt in failing to relinquish E.V. to agency custody, not on her failure to appear on March 22. Indeed, despite the caption and passing reference to mother's failure to appear at the March 22, 2024 contempt hearing, the magistrate's April 3, 2024 order promptly shifts back to the issue of mother's role in secreting

E.V.  The magistrate's order finds mother "to be in direct contempt of this Court's order of February 21, 2024" (the order granting predispositional temporary custody of E.V. to the agency), issues an arrest warrant to bring her before the court, and notes that the warrant would be recalled if she relinquished E.V. to the agency's custody.  The warrant was issued on April 3, 2024.

{¶ 15} Once again, the magistrate did not mention a jail sentence or fine. While the order specified that mother was to be arrested and held until further order, it contained the purge condition referenced above, specifically: "If mother relinquishes the child to the agency's custody the warrant may be recalled." *Id.*

{¶ 16} The juvenile court adopted the magistrate's contempt order in its entirety on April 11, 2024.  The juvenile court's order is virtually identical to the magistrate's orders issued March 22 and 26, 2024.

{¶ 17} On April 5, 2024, mother filed a motion to dismiss the complaint.  She argued that pursuant to Juv.R. 29(B), the scheduled adjudication hearing was required to be held no later than March 6, 2024.

{¶ 18} On April 11, 2024, mother filed a motion for leave to file objections to the magistrate's March 22 and March 26 decisions, to supplement or amend the objections upon receipt of transcripts, and to stay warrant issuance.  Mother argued that she "was never arraigned" on the contempt issue, that she did not have proper notice, and that the juvenile court erred in not granting her motion to continue the March 22, 2024 contempt hearing, particularly in light of her counsel's inability to be present due to health issues.  The juvenile court denied that motion on April 19,

2024. It also denied mother's motion for leave to file objections and her motion to supplement those objections and file amended objections based upon the transcript of the March 22, 2024 hearing.

{¶ 19} In a separate order issued April 19, 2024, with respect to the March 22 and March 26 magistrate's decisions, the juvenile court noted that the agency still had not located E.V. and that mother "has been consistently advised that she could be found in direct contempt of this Court's order for purposely failing to relinquish the child to the custody of the Agency pursuant to a Direct Court order." The juvenile court again found mother "to be in direct contempt of this Court's order of February 21, 2024," and again ordered her arrest, noting that the warrant may be recalled if mother relinquished E.V. to the agency's custody. *Id.* On April 23, 2024, mother was arrested on the warrant.

## C. April 25, 2024 Adjudicatory Hearing, Dispositional Hearing, and Contempt Sentencing

{¶ 20} The case proceeded to trial on April 25, 2024, before a juvenile court magistrate. The proceedings encompassed (1) adjudication on the complaint for neglect; (2) disposition as to custody; and (3) mother's punishment for contempt of court. Mother was transported from the Cuyahoga County Jail for purposes of the trial; she was present and represented by counsel. Furthermore, as detailed below, the transcript of the disposition/contempt hearing indicated that E.V. had been located and taken into custody by North Olmsted police that very day, while mother was present at the hearing. (Disposition/Contempt tr. 19-20.)

### 1. Adjudicatory Hearing

{¶ 21} For purposes of adjudication, the magistrate heard testimony and accepted exhibits with respect to the complaint for neglect. The agency presented the testimony of CCDCFS caseworker Deininger, as well as two individuals associated with the North Olmsted schools, namely, North Olmsted High School Principal Noelle Ostrowski and North Olmsted Police Department School Resource Officer Patrick Scullin. Several exhibits were admitted without objection.

{¶ 22} Deininger testified that the agency received a call regarding alleged educational neglect in October or November 2023. E.V. had been enrolled in Berea schools from September 13, 2023, to November 29, 2023. He accumulated 48 unexcused absences and was failing every class. (Adjudication tr. 12-13.) Over the course of a month or so, she attempted to investigate by visiting mother's house "several times." (Adjudication tr. 10-11.) Deininger also wrote letters to mother and phoned both mother and father. Deininger testified she "did not get any engagement from the parents" and that during that time period she "wasn't ever able to speak to the parents regarding the allegations." (Adjudication tr. 11.) She testified that one of the reasons the agency requested emergency custody was its inability to have contact with mother: "There was concerns that mom wasn't allowing us access to the child. We couldn't assess safety." (Adjudication tr. 54.)

{¶ 23} As discussed above, Deininger's review of school records revealed that E.V. was habitually absent from school and that he failed all his classes in the Berea school district. E.V. was subsequently enrolled at North Olmsted High School in late

November 2023. (Adjudication tr. 14.) As detailed below, however, he was expelled on his first day of attendance.

{¶ 24} Deininger thereafter "scheduled a staffing for the family," principally because of the habitual truancy and the lack of cooperation by mother. (Adjudication tr. 15.) Deininger testified that mother "never answered me or let me in the home." (Adjudication tr. 15.) Deininger attempted to notify the parents by letter, and "even taped one to mom's front door." (Adjudication tr. 15.) Neither parent appeared for the staffing.

{¶ 25} At that point, Deininger spoke with the prosecutor's office about a FIRST program, described as "a program where instead of Agency involvement, the Agency and the Public Defender's Office work with the family to try to resolve the issues without becoming Court-involved." (Adjudication tr. 16.) According to Deininger, the public defender's office communicated with mother about the program, but "she declined to participate." (Adjudication tr. 16.) In addition, E.V. had a pending delinquency case from 2023. Neither E.V. nor his parents had appeared in court, leading to a warrant for his arrest. (Adjudication tr. 16-19 and 51-52.) CCDCFS thereafter filed the instant complaint in February 2024.

{¶ 26} Deininger testified further concerning her efforts to locate E.V., principally revisiting her testimony at the March 22, 2024 hearing. (Adjudication tr. 19-27.) Mother's counsel cross-examined Deininger concerning the efforts to locate E.V. and mother's purported cooperation. For example, mother submitted an email sent from mother to Deininger dated March 6, 2024 — prior to the March 22

contempt hearing — and cross-examined Deininger regarding its contents. (Adjudication tr. 30-34.) Deininger conceded she could understand why, in these circumstances, a parent might want to communicate in writing. (Adjudication tr. 34.) When mother's counsel attempted to delve further into the March 22, 2024 contempt proceedings, however, the magistrate stopped her, indicating, "[W]e'll address the contempt at a later time." (Adjudication tr. 41.) The magistrate further commented: "We're not addressing mother's warrant, mother's violation of Court order. We're addressing the allegations as relate to this child in this Complaint." The magistrate continued: "There's two allegations and it's as of the date of filing, which is February 1st. Things that happened subsequent to that have no relevance to this trial. I've tried to give you latitude, but stick to what we are here for right now." (Adjudication tr. 42-43.) Mother's counsel protested that the agency had been permitted to elicit testimony from Deininger about mother's involvement in allegedly hiding E.V. from the agency and that her cross-examination was therefore within the scope of the direct. The magistrate responded: "You are way beyond the scope right now. You're going into a contempt hearing that I told you we would address later. Move on." (Adjudication tr. 43.)

{¶ 27} North Olmsted High School Principal Ostrowski testified that she met E.V. on December 5, 2023. A school aide brought him to Ostrowki's office after she observed him "walking through the hallway and smoking from [a] vape pen." (Adjudication tr. 64.) Ostrowski "had never seen him before." (Adjudication tr. 63.) Ostrowski observed that E.V. "looked like he didn't feel very well." *Id*. She asked if

he needed water because he "was swaying a little bit." *Id.* She brought over a garbage can and asked E.V. to sit down "because he looked like he was going to get sick." *Id.* Ostrowski determined that E.V. was enrolled at the school, but the family never appeared to make a schedule. The school therefore made a schedule "as best we could with what we had in front of us." (Adjudication tr. 73.)

{¶ 28} Ostrowski testified that she requested E.V. to turn over the vape pen, but that he refused even after Ostrowski explained the possible consequences, including expulsion. The school contacted mother, who indicated she was not able to come to the school but that E.V. could be taken to another relative.

{¶ 29} The school ultimately contacted law enforcement. North Olmsted Police Department School Resource Officer Scullin testified that they transported E.V. home. According to Scullin, E.V.'s brother answered the door. The police asked to speak to mother, but she did not come to the door.

{¶ 30} The school scheduled an expulsion hearing for December 13, 2023. It was set up as a virtual meeting "so that all parties could attend." (Adjudication tr. 69.) Ostrowski testified that she and other school district officials "were in [the expulsion] meeting for a half-hour," but that no one attended. (Adjudication tr. 69 and 84.) The result was E.V.'s expulsion until May 10, 2024.[4] Ostrowski further explained, however, that the expulsion included a stay of 30 days, and that E.V.

---

[4] At this point, there was no indication that E.V. had a 504 Plan or IEP that would require a manifestation hearing prior to expulsion. (Adjudication tr. 77-78.)

could have taken certain steps (including providing the school with a negative drug test) to return as early as March 18, 2024.

{¶ 31} After confirming that neither the GAL nor the self-represented father intended to call witnesses, the magistrate heard closing arguments. The magistrate then made detailed findings on the record, concluding there was "clear and convincing evidence" that E.V. "is in fact a neglected child." (Adjudication tr. 122-123.)

## 2. Dispositional Hearing

{¶ 32} The case then proceeded to a dispositional hearing on the agency's request for temporary custody to CCDCFS. The magistrate heard testimony from caseworker Deininger and the GAL.[5] All testimony and exhibits from the adjudicatory hearing were incorporated in the dispositional hearing record without objection.

{¶ 33} Caseworker Deininger testified that the permanency plan for E.V. was reunification, with a case plan that included services to address both school attendance and substance abuse. Deininger described mother as "evasive" and explained that this caused an inability to evaluate mother for appropriate case-plan services: "I have had very limited contact with her. I haven't gained access to the home. I would say that that is a concern being able to get into the home to be able to assess safety." (Disposition/Contempt tr. 21.)

---

[5] Father, who remained present for the dispositional hearing, waived his right to call witnesses and indicated his agreement with the agency's request for temporary custody, as well as the agency's case plan. (Disposition/Contempt tr. 5.)

**{¶ 34}** Deininger also informed the magistrate that during the proceedings that very day, E.V. had been located by North Olmsted police and was being transported to the juvenile justice center. The circumstances were unclear: "All I know, my supervisor . . . just said she got a phone call from the North Olmsted police stating that they have [E.V.]." Deininger explained she received a text message to that effect at 3:10 p.m., which placed her receipt of the text message between the conclusion of the adjudicatory hearing (adjourned at 2:52 p.m.) and the commencement of the dispositional hearing at 3:36 p.m.

**{¶ 35}** Deininger further testified that her efforts to find another relative for placement had been unfruitful. She testified that she believed the case plan was in E.V.'s best interests due to his habitual truancy and nicotine use, as well as the pending delinquency case. She stated that he had been missing "up until today" and that the agency "can't help him if we don't know where he is." (Disposition/Contempt tr. 13-14 and 28.) Deininger testified that in order to ensure that services were actually provided and that the agency could address any complications that might arise, "[t]emporary custody to the Agency is the only option." (Disposition/Contempt tr. 14 and 30-31.) Deininger also indicated the agency intended to discuss the case plan with E.V. to determine, among other things, whether there were any other relatives who might be appropriate placements.[6] The

---

[6] Deininger testified that father had had no contact with E.V. for the past two years. (Disposition/Contempt tr. 20.)

agency also planned to work further with both mother and father with respect to the case plan.

{¶ 36} The GAL indicated he had spoken only briefly with E.V., by phone, in February 2024. He recommended agency involvement, clarifying that "without being able to actually sit down and really feel him out as far as what's been going on with him not going to school and things like that, it's hard for me to say what's in his best interest." (Disposition/Contempt tr. 35.) The GAL did note that during the call, E.V. "did say on the phone" that "he wanted to remain with mom." (Disposition/Contempt tr. 35.)

{¶ 37} The magistrate then heard closing arguments, with the agency urging adoption of the case plan, including temporary custody of E.V. to CCDCFS. Mother advocated for continued custody under protective supervision. E.V.'s counsel agreed, also urging protective supervision.

{¶ 38} The magistrate found that it would not be in E.V.'s best interests to be in mother's custody at that point and that the agency made reasonable efforts to prevent the removal of E.V. from mother's custody. (Disposition/Contempt tr. 51.) The magistrate found it was in E.V.'s best interest to be committed to the temporary custody of CCDCFS. (Disposition/Contempt tr. 52.) The court, noting that the complaint had been filed February 5, 2024, stated the order would remain in place until February 4, 2025, and scheduled a review hearing to be conducted January 28, 2025.

### 3. Contempt Sentencing

**{¶ 39}** Having stated its findings and conclusions on the record with respect to the disposition of temporary custody, the magistrate turned to the issue of mother's punishment related to the previous finding of contempt. The magistrate excused caseworker Deininger, the sole witness at the March 22, 2024 contempt hearing.[7] The magistrate did not take further testimony with respect to either the underlying finding of contempt, indicating "the hearing was held" and that "[w]e are not relitigating the contempt." (Disposition/Contempt tr. 57.) The magistrate stated that "for purposes of today this Court is going to be sentencing mother on that finding of direct contempt." (Disposition/Contempt tr. 55-56.)

**{¶ 40}** The magistrate accordingly limited the scope of argument by mother's counsel, stating that "[t]he purpose of today's hearing is what the appropriate sentence should be as to the contempt," and "[t]hat's what you need to speak to." (Disposition/Contempt tr. 57.) The magistrate made clear that the purpose of this component of the hearing was to impose punishment, not to induce compliance: "The time for mother to have mitigated any sentence would have been prior to arrest yesterday [sic] to turn the child over to the Agency." (Disposition/Contempt tr. 60.) The magistrate stated multiple times that mother had been found to be in "direct contempt." (Disposition/Contempt tr. 55, 56, 61, and 62.) At the conclusion of the hearing, the magistrate sentenced mother to 30 days in jail, noting that mother had

---

[7] As discussed above, the GAL made remarks at the March 22, 2024 hearing. He did not, however, provide testimony under oath.

been taken "into custody two days ago, on Tuesday[, April 23, 2024,] I believe, and today's Thursday." The magistrate therefore gave mother "three credit days, credit for time served," and suspended the $250 fine. (Disposition/Contempt tr. 62.) The magistrate ordered mother "remanded back to jail to complete her sentence." (Disposition/Contempt tr. 62-63.)

{¶ 41} Following the hearing, the magistrate issued three decisions with extensive findings of fact and conclusions of law, all dated April 26, 2024. The first adjudicated E.V. to be neglected. The second ordered that E.V. be committed to the temporary custody of the agency. The third decision found mother to be in direct contempt of court. With respect to contempt, the magistrate wrote, in pertinent part:

> The Court finds that mother has flagrantly violated a direct court order after being advised of the consequences of such action. Further, she has by her violation caused further harm to the child. Her actions have resulted in the child being AWOL for more than two months and further resulted in a warrant being issued for her son's arrest due to his failure to appear before the court on his own delinquency charge.
>
> Whereupon it was brought to this Court's attention that the child, [E.V.], was found and arrested by North Olmsted Police and was to be brought directly to Cuyahoga County Juvenile Detention Center. Child was located in the home of the mother.
>
> Mother has demonstrated a total disregard for the authority of the Court and more importantly the safety and well-being of her child.
>
> It is therefore ordered that [mother], having previously been found to have violated a direct court order and further having been found in Contempt of Court pursuant to RC 2705.01 then the following sanction shall be imposed: Incarceration in the Cuyahoga County Jail for a term of thirty (30) days is ordered. Credit for three (3) days time served. The $250.00 fine is hereby suspended.

Mother is remanded to the Cuyahoga County Jail to complete her sentence.

{¶ 42} Mother filed objections to the magistrate's orders on April 30, 2024. While the objections reference multiple orders, indicating they were attached "as Exhibit A and Exhibit B" to the motion, only the dispositional order of temporary custody was attached, along with a Lexis printout of a 2010 Ninth District opinion pertaining to truancy as a component of neglect. The objections do not appear to address the issue of contempt. The agency's opposition, likewise, focuses on mother's neglect and custody arguments.

### D. Habeas Petition, the Present Appeal, and Subsequent Juvenile Court Proceedings

{¶ 43} On May 3, 2024, mother, still in jail, filed a petition for writ of habeas corpus with this court, *T.C. v. Judge Thomas F. O'Malley*, 8th Dist. Cuyahoga No. 113896. The same day, this court issued a journal entry staying the order of confinement and ordering the release of mother on her own recognizance. This court's order included the following language:

> Pursuant to Civ.R. 53(C)(3)(f) and Civ.R. 53(D)(8), a magistrate may impose sanctions or criminal contempt for action committed in the presence of the magistrate. Contempt sanctions may be imposed only by written order that recites the facts and certifies that the magistrate saw or heard the conduct constituting contempt. Civ.R. 53(D)(8)(a). The order is subject to immediate review by the judge on motion and the judge or magistrate may set bail pending judicial review. Civ.R. 53(D)(8)(c).

(Motion No. 574206.)

{¶ 44} On May 8, 2024, mother filed in juvenile court a "motion for immediate review ab initio[;] motion to stay order pending appeal[; and] motion to

void ab initio." Mother's brief begins with a near-verbatim recitation of this court's May 3 order. On the same day, however, prior to any ruling on her motion for immediate review and other relief, mother filed her notice of appeal in the present action. The motion attached multiple orders from the juvenile court judge and magistrate, all related to the contempt finding.

{¶ 45} On May 9, 2024, mother filed amended objections with the juvenile court, which included a challenge to the contempt citation, the adjudication of neglect, and the disposition of temporary custody to the agency.[8] The same day, a hearing was held before this court on the habeas petition. Then on May 10, 2024, this court issued an order directing the juvenile court trial judge to review the magistrate's contempt order. The order reads, in its entirety:

> Sua sponte, within 30 days of the date of this order, respondent Judge . . . is directed to personally review [the magistrate's] April 26, 2024 contempt order pursuant to petitioner's "motion for immediate review ab initio motion to stay order pending appeal motion to void ab initio," filed May 8, 2024, including any transcript supplied by petitioner in those proceedings. Respondents shall file in this court a copy of his decision along with a notice of compliance on the same date a ruling is filed for journalization in the juvenile court. This court will review and decide respondents' motion to dismiss and the merits of petitioner's action after respondents' notice of compliance is filed. This court's stay of the jail sanction imposed by [the magistrate's] April 26, 2024 order remains in effect until further order of this court.

(Motion No. 574356.)

---

[8] The juvenile court ultimately overruled the objections on June 25, 2024, prompting the filing of mother's fourth amended notice of appeal on July 1, 2024. The fourth amended notice of appeal is discussed in more detail below.

**{¶ 46}** In the present appeal, on May 10, 2024, we remanded the case to the trial court, writing in a journal entry:

> Sua sponte, to remove the appearance of any jurisdictional impediment, this appeal is remanded to the trial judge to personally review and rule on appellant's motion for immediate review that was filed on May 8, 2024. *Should that ruling result in a new final order, appellant shall amend the current appeal with the new order pursuant to App.R. 3(F)(1) as long as the amendment is not more than 30 days after the order was entered.* The trial court shall also rule on the pending motion for stay that was filed on May 8, 2024. The record, supplemented by any filings made during the remand shall be returned to this court within 30 days from the date of this order.

(Emphasis added.) (Motion No. 574355.)

**{¶ 47}** On May 22, 2024, following this court's remand, the juvenile court judge issued its ruling. The juvenile court found mother in direct contempt of court "pursuant to R.C. 2705.01" and sentenced her to "[i]ncarceration in the Cuyahoga County Jail for a term of twelve (12) days," with three days credit for time served, thereby reducing the 30-day sentence imposed by the magistrate. The juvenile court explicitly declined to rule on all other aspects of mother's May 8, 2024 motion:

> The remainder of mother's Motion raises a myriad of other issues unrelated to her contempt, including whether the adjudication hearing was untimely; whether the adjudication and dispositional hearings were not properly bifurcated; and whether truancy constitutes statutory dependency and/or neglect. None of these issues are proper for consideration in a motion pursuant to Juv. R. 40(D)(8) and this Court therefore declines to address them in this Motion.

**{¶ 48}** Mother filed her third amended notice of appeal on May 24, 2024, attaching both the juvenile court's ruling on the contempt issue and its ruling (also issued May 22, 2024) on various aspects of her objections. In that separate entry, the juvenile court ordered mother "to file a copy of the transcript by May 31, 2024,"

and to "file any supplemental objections by June 7, 2024." On May 24, 2024, mother filed a motion seeking a stay of the juvenile court's contempt order, focusing entirely on the finding of contempt.

{¶ 49} By order dated May 29, 2024, we extended the remand order, writing: "Sua sponte, the remand ordered by this court on May 10, 2024, is extended to June 28, 2024, so that the trial judge may rule on objections to the magistrate's decision." (Motion No. 574908.)

{¶ 50} Further, by order dated June 3, 2024, mother obtained from this court an indefinite stay of the trial court order of confinement as requested in her May 24, 2024 motion. This court wrote that "[t]he May 22 and April 26, 2024 orders imposing a 12-day jail term on [mother] are stayed pending the outcome of this appeal." (Motion No. 574849.)

{¶ 51} On July 1, 2024, mother filed her fourth amended notice of appeal. This notice of appeal attached, inter alia, multiple rulings from the juvenile court dated June 25, 2024. In those decisions, the juvenile court addressed mother's amended objections, including those related to the issues of neglect and temporary custody to the agency, and those related to the previous contempt citation. Somewhat confusingly, despite the May 22, 2024 entry reducing mother's jail sentence to 12 days, the juvenile court repeated its finding of direct contempt in two separate entries, both times ordering "[i]ncarceration . . . for a term of thirty (30) days," with three days credit for time served. The juvenile court overruled all

objections as to contempt, the adjudication of neglect, and the disposition of temporary custody to the agency.

{¶ 52} The record on appeal was filed August 2, 2024. Notably, the record includes docket entries only up to and including May 8, 2024. Neither the juvenile court's May 22, 2024 contempt order nor the various June 25, 2024 orders were included with the record.

{¶ 53} On December 2, 2024, we granted mother's motion for an order for the lower court to transmit an updated trial record. We noted that "[t]he court of appeals record contains the trial court filings up until May 8, 2024," and specified that "[t]he record should include all filings up until the trial court issued its final order on May 22, 2024." We ordered that the juvenile court supplement the record with these additional filings and specified a deadline of December 16, 2024. (Motion No. 579798.) The juvenile court supplemented the record on February 3, 2025.

{¶ 54} On March 26, 2025, we issued a sua sponte order indicating that "the record shall be supplemented with the filings from the juvenile court entered May 23, 2024 through June 25, 2024," with the supplemental record "due on or before April 2, 2025." (Motion No. 583101.) The supplemental record was received on March 28, 2025.

{¶ 55} Mother presents four assignments of error for our review:

I. The trial court abused its discretion, violated Mother's Due Process Rights, as it pertains [to] the Contempt.

II. The Trial Court's Decisions, Orders, and Actions, as it pertains to the Contempt was against the Manifest Weight of Evidence.

III. The trial court abused its discretion, violated Mother's Due Process Rights, and went against the manifest weight of evidence as it pertains to Adjudication.

IV. The trial court abused its discretion, violated Mother's Due Process Rights, and went against the manifest weight of evidence as it pertains to Disposition.

## II. Law and Analysis

### A. First Assignment of Error — Contempt — Abuse of Discretion and Due Process

**{¶ 56}** Mother's first and second assignments of error both concern the finding of contempt and associated sentence. In her first assignment of error, mother contends that the juvenile court abused its discretion and violated mother's due-process rights with respect to contempt. We agree.

**{¶ 57}** We review a court's contempt decision for an abuse of discretion:

> The determination of contempt is within the trial court's discretion and will not be reversed absent an abuse of that discretion. *Cleveland v. Heben*, 74 Ohio App.3d 568, 573, 599 N.E.2d 766 (8th Dist.1991); *State v. Kilbane*, 61 Ohio St.2d 201, 400 N.E.2d 386 (1980). An abuse of discretion occurs when the trial court's decision is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

*State v. Lanzy (In re Christman)*, 2022-Ohio-1937, ¶ 6 (8th Dist.); *Parma v. Novak (In re Huth)*, 2020-Ohio-3177, ¶ 16 (8th Dist.). *See also E. Cleveland Firefighters v. E. Cleveland*, 2017-Ohio-1558, ¶ 21 (8th Dist.).

#### 1. Direct Versus Indirect Contempt

**{¶ 58}** Generally, judges have contempt powers necessary to enforce the orders of the court and to protect the dignity of proceedings. *See* R.C. 2705.01 and

2705.02. Those powers existed at common law and are inherent and necessary for the orderly administration of justice. R.C. 2705.01 allows for summary punishment for acts of contempt that take place in front of the judge. It provides: "A court, or judge at chambers, may summarily punish a person guilty of misbehavior in the presence of or so near the court or judge as to obstruct the administration of justice." Juv.R. 40 and Civ.R. 53, governing the authority of magistrates, contain similar wording giving a magistrate the power to impose civil or criminal sanction for acts of direct contempt "committed in the presence of the magistrate." Juv.R. 40(C)(2)(f). *See also* Civ.R. 53(C)(3)(f).

**{¶ 59}** All other acts generally constitute acts of *indirect* contempt. *Cleveland v. Bright*, 2020-Ohio-5180, ¶ 26 (8th Dist.). R.C. 2705.02 includes a nonexhaustive list of acts that generally constitute indirect contempt. Relevant here, this includes, "[d]isobedience of, or resistance to, a lawful writ, process, order, rule, judgment, or command of a court or officer." Indirect contempt "'occurs outside the presence of the court and demonstrates a lack of respect for the court or its lawful orders.'" *SKF United States, Inc. v. Zarwasch & Heza Seals, L.L.C.*, 2013-Ohio-2543, ¶ 16 (8th Dist.), quoting *Sansom v. Sansom*, 2006-Ohio-3909, ¶ 23 (10th Dist.). *See also Gordon v. Gordon*, 2023-Ohio-4780, ¶ 14 (5th Dist.).

**{¶ 60}** The magistrate and juvenile court judge treated mother's failure to relinquish custody of a child as an act of direct contempt. The record is replete with references to "direct contempt," not only in the transcripts, but even the journal entries finding mother in contempt. Indeed, the journal entries cite the direct

contempt statute, R.C. 2705.01, rather than the indirect contempt statute, R.C. 2705.02. All of the journal entries finding mother in contempt, however, state that she was found in contempt for failing to comply with the February 21, 2024 order awarding emergency temporary custody to the agency. There is no reference to misbehavior in the court's presence. As discussed above, the failure to abide by a court order is an act of indirect contempt. On those occasions where mother appeared, she was represented by counsel, and nothing in the record indicates that on those occasions she spoke disrespectfully to the court, to other counsel, or to the witnesses.

{¶ 61} Even though classified as direct contempt, the magistrate's various orders, the juvenile court's order of May 22, 2024, and the juvenile court's June 25, 2024 ruling on amended objections all sanctioned mother for acts of indirect contempt. The magistrate found that mother failed to obey a court order and, in fact, secreted or harbored her child in violation of an order that required her to relinquish custody of a child to CCDCFS. These actions did not occur in the presence of, or near, the magistrate or the juvenile court judge. This was indirect contempt rather than direct contempt.

### 2. Civil Versus Criminal Contempt

{¶ 62} Contempt may be persuasive in nature (civil) or punitive in nature (criminal). The Ohio Supreme Court has stated:

> "Although there has never been a clear line of demarcation between criminal and civil contempts, it is usually said that offenses against the dignity or process of the court are criminal contempts, whereas

violations which are on their surface offenses against the party for whose benefit the order was made are civil contempts."

*In re Mallory-Nichols*, 2023-Ohio-3982, ¶ 14 (8th Dist.), quoting *State v. Local Union 5760, United Steelworkers of Am.*, 172 Ohio St. 75, 82 (1961), *overruled on other grounds*, *Brown v. Executive 200, Inc.*, 64 Ohio St.2d 250 (1980), citing *O'Brien v. People*, 216 Ill. 354, 368 (1905).

{¶ 63} Criminal contempt imposes sanctions for past disobedience, while civil contempt prompts future compliance with the threat of a sanction. As a result, a civil contempt order is generally characterized by a finding of contempt, the threat of a sanction, and the ability to avoid the sanction by satisfying a condition or conditions to purge the finding of contempt. *See, e.g., Bright*, 2020-Ohio-5180, at ¶ 21 (8th Dist.) ("Any sanction imposed for civil contempt must afford the contemnor the right to purge himself of the contempt."); *Sansom*, 2006-Ohio-3909, at ¶ 24 (10th Dist.). "'Civil contempt sanctions are designed for remedial or coercive purposes and are often employed to compel obedience to a court order.'" *Bright* at ¶ 21, quoting *State ex rel. Corn v. Russo*, 90 Ohio St.3d 551, 555 (2001). The Ohio Supreme Court has long held that in civil contempt proceedings, "[t]he contemnor is said to carry the keys of his prison in his own pocket . . . since he will be freed if he agrees to do as ordered." *Brown* at 253.

{¶ 64} In contrast, "[t]he punishment for criminal contempt . . . 'is "punishment for the completed act of disobedience" and usually consists of fines and/or an unconditional period of incarceration.'" *Cleveland v. Goodman*, 2020-

Ohio-2713, ¶ 30 (8th Dist.), quoting *Camp-Out, Inc. v. Adkins*, 2007-Ohio-3946, ¶ 21 (6th Dist.), quoting *In re Purola*, 73 Ohio App.3d 306, 311 (3d Dist. 1991). Thus, "[t]he 'distinction is based on the character and purpose of contempt sanctions imposed.'" *Columbus v. ACM Vision, V, LLC*, 2021-Ohio-925, ¶ 34 (10th Dist.), quoting *Boston Hts. v. Cerny*, 2007-Ohio-2886, ¶ 19 (9th Dist.).

**{¶ 65}** We "look to the entire record to determine the purpose of the sanction." *Bright* at ¶ 22. The magistrate's remarks at the conclusion of the March 22, 2024 contempt hearing, as well as the magistrate's order of April 3, 2024, and the juvenile court's April 11, 2024 order adopting the magistrate's opinion, contain purge conditions, indicating that the arrest warrant may be recalled if mother relinquished E.V. to the agency. Even though they included a threat of imprisonment, they are consistent with the goal of civil contempt, namely, to induce future compliance under threat of sanction, with that sanction lifted, or never even imposed, if the contemnor complies with the underlying order.

**{¶ 66}** The magistrate's April 26, 2024 order, however, as well as the juvenile court judge's subsequent orders of May 22 and June 25, 2024, are better viewed as criminal-contempt sanctions. The orders do not offer any means to purge the finding of contempt. Indeed, by the time the magistrate reached the contempt sentencing portion of the April 25, 2024 hearing, there were no purge conditions for mother to satisfy; as the magistrate acknowledged on the record and in the April 26 order, E.V. had been taken into custody by North Olmsted police. His whereabouts were then known, and he was committed to temporary custody of the agency. As

detailed above, the magistrate framed this portion of the April 25 proceeding as a determination of "the appropriate *sentence* . . . as to the contempt." (Emphasis added.) (Disposition/Contempt tr. 57.) Thus, the ultimate sanction imposed on mother, including the May 22, 2024 and June 25, 2024 entries by the juvenile court judge, was an unconditional period of incarceration, a criminal-contempt sanction.

{¶ 67} The amount of constitutional protections observed in contempt proceedings depends on the type of contempt at issue, ranging from minimal for acts of direct contempt to the range of due-process rights normally afforded to criminal defendants for acts of indirect criminal contempt. *Schrader v. Huff*, 8 Ohio App.3d 111 (9th Dist. 1983). The ability of a judge to restrain a person's liberty in direct criminal contempt without observing due-process rights is allowed because all the necessary facts to prove the elements of the offense are known to the trial court because these events occurred before the trial court. *Bright*, 2020-Ohio-5180, at ¶ 27 (8th Dist.). Where the judge does not have direct evidence of all the elements that constitute the contemptuous acts, however, due process must be afforded.

{¶ 68} R.C. 2705.03 provides that punishment for acts of contempt defined under R.C. 2705.02, including disobedience of a court order, shall require certain formalities including the right to notice of the charge in writing and the right to be heard:

> In cases under section 2705.02 of the Revised Code, a charge in writing shall be filed with the clerk of the court, an entry thereof made upon the journal, and an opportunity given to the accused to be heard, by himself or counsel. This section does not prevent the court from issuing

process to bring the accused into court, or from holding him in custody, pending such proceedings.

R.C. 2705.03. *See Cleveland v. Dixon*, 2020-Ohio-2728, ¶ 23 (8th Dist.).  We have stressed the importance of compliance with these due-process protections in the context of both direct and indirect contempt, stating that

> [r]egardless of the classification of the contempt [as direct or indirect], where a judge has no personal knowledge of the alleged act of contempt and must rely on information provided by court personnel to establish contempt, "the procedure outlined in R.C. 2705.03, requiring a written charge, an adversary hearing upon the issues, and an opportunity for the accused to be represented by counsel, should be strictly adhered to."

*Novak*, 2020-Ohio-3177, at ¶ 11 (8th Dist.), quoting *In re Chambers*, 2019-Ohio-3596, ¶ 32 (1st Dist.).

**{¶ 69}** The distinction between civil and criminal contempt also comes into play with respect to conducting the contempt hearing.  As discussed above, "[a]mong the rights afforded to both civil and criminal contemnors are notice and an opportunity of a hearing on the matter."  *Cleveland v. Bryce Peters Fin. Corp.*, 2013-Ohio-3613, ¶ 36 (8th Dist.).  But both a heightened standard of proof and enhanced due-process protections apply in the context of criminal contempt.  As we explained in *Bright*:

> The Ohio Supreme Court explained that "[t]he most important consequences arising from this classification of contempts is that many of the significant constitutional safeguards required in criminal trials are also required in criminal contempt proceedings." [*State v. Kilbane*, 61 Ohio St.2d 201, 205 (1980)].  Specifically, this includes "the right to notice of the charges, the right to defend oneself and be heard, the right to counsel, *and the right that there be proof beyond a reasonable doubt to support a conviction*."  *Internatl. Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 826, 114 S.Ct. 2552, 129

L.Ed.2d 642 (1994). *Moreover, a criminal contemnor must be present at the contempt hearing. Adams v. Epperly*, 27 Ohio App.3d 51, 52-53, 499 N.E.2d 374 (9th Dist.1985).

In contrast, the standard of proof for civil contempt is clear and convincing evidence. *Carroll v. Detty*, 113 Ohio App.3d 708, 711, 681 N.E.2d 1383 (4th Dist.1996). In a civil contempt, an alleged contemnor is entitled only to those rights afforded in a civil action. *Schrader v. Huff*, 8 Ohio App.3d 111, 112, 456 N.E.2d 587 (9th Dist.1983). *Thus, although a person charged with civil contempt must receive notice and have an opportunity to be heard, the alleged contemnor can be tried and sanctioned in absentia. Cleveland v. Bryce Peters Fin. Corp.*, 8th Dist. Cuyahoga Nos. 98006-98024, 98078, 98079, 98163, and 98164, 2013-Ohio-3613, ¶ 36-37.

(Emphasis added.) *Bright* at ¶ 23-24.

**{¶ 70}** With these due-process precepts in mind, we return again to the facts. With respect to notice of the March 22, 2024 contempt hearing, mother argues that the agency did not file a motion to show cause. She ignores, however, the juvenile court's sua sponte show-cause order issued March 15, 2024, quoted in detail above. The Ohio Supreme Court, interpreting R.C. 2705.03, has held that "[t]he function of written notice is to apprise the defendant of the charges against him so that he is able to prepare his defense." *Cincinnati v. Cincinnati Dist. Council 51*, 35 Ohio St.2d 197, 203 (1973), *cert. denied*, 415 U.S. 994 (1974), citing *Foutty v. Maxwell*, 174 Ohio St. 35 (1962). Thus, where a show-cause order "apprised the appellant of both the nature of the proceeding" (in that case civil contempt) and "the reason for the proceeding" (the alleged violation of a previous court order), the court found no discernible prejudice. *Cincinnati Dist. Council 51* at 203-204.

**{¶ 71}** We find that the March 15, 2024 show-cause order issued by the trial court was sufficient to put mother on notice of the reason for the proceeding, i.e.,

that mother had been ordered to turn the child over to the agency.  It is vague, however, as to the nature of the proceedings, failing to distinguish between civil and criminal contempt.  The show-cause order itself contains no purge conditions.  In addition, it states that if mother is found to be in contempt, she "will be subjected to a jail sentence and/or fine *pursuant to statute.*"  (Emphasis added.)  By threatening a "jail sentence and/or fine" rather than confinement until the underlying court order is obeyed, or (for example) a daily monetary sanction tied to continued disobedience of the court order, the magistrate appeared to be referencing the criminal-contempt sanctions found in R.C. 2705.05.[9]

**{¶ 72}** We need not dwell on that ambiguity.  It might have been harmless if the contempt proceedings terminated with a finding of civil contempt with purge conditions.  The juvenile court ultimately went beyond that, however, when it sentenced mother to an unconditional period of incarceration.  It did so without either (a) holding a hearing on the underlying contempt with mother in attendance; or (b) clearly announcing that in finding mother guilty of contempt, it applied the applicable standard of proof, i.e., proof beyond a reasonable doubt.

---

[9] We have previously emphasized that "[a]lthough the Revised Code sets forth caps on jail time and fines for contempt in R.C. 2705.05, the Ohio Supreme Court held in *Local Union 5760* . . . that '[t]he inherent power of a court to punish for contempt of court may not be limited by legislative authority, nor does such power depend upon express constitutional grant.'"  *Bright*, 2020-Ohio-5180, at ¶ 42 (8th Dist.), quoting *Local Union 5760* at paragraph one of the syllabus.  The statutes "are merely cumulative to a court's inherent contempt power, and they do not in any way abridge that inherent power."  *Id*. at ¶ 35.  These precepts, however, are not relevant in this instance, where our decision does not turn on whether the jail time ultimately imposed conflicts with the statutory maximum.

{¶ 73} As discussed above, a person charged with criminal contempt may not be tried in absentia. *Bright* at ¶ 24. Mother was not present for the evidentiary hearing on the facts underlying the alleged contempt, which took place on March 22, 2024. Although she was present for the April 25, 2024 adjudicatory, dispositional, and contempt hearings, the magistrate refused to take testimony or allow mother to confront witnesses before imposing a jail term for criminal contempt. At the commencement of the April 25 contempt proceedings, the magistrate excused agency caseworker Deininger, the sole witness against mother at the March 22, 2024 contempt hearing, where mother had not been present. She refused to hear further testimony, indicating "the hearing was held" and that "[w]e are not relitigating the contempt." The magistrate stated that "for purposes of today this Court is going to be sentencing mother on that finding of direct contempt."

{¶ 74} It is true that the March 22, 2024 contempt hearing and the entries emanating therefrom had the whiff of civil contempt due to the purge condition. The focus of the April 25 hearing, however, was punishment. Because all the facts relating to the underlying contempt finding had been relayed to the juvenile court in a hearing at which mother was not present and given the opportunity to confront witnesses, mother was essentially tried in absentia and only sentenced in person. The April 25 hearing did not cure that due-process issue because the magistrate did not allow mother to call witnesses as to the contempt or confront the sole witness against her, a witness the magistrate excused at the commencement of the sentencing hearing. It was reversible error for the magistrate to impose a criminal-

contempt sanction with an unconditional term of confinement under these circumstances, and the juvenile court erred when it issued its May 22, 2024 ruling adopting the unconditional criminal-contempt sanction (with sentencing modifications not relevant here) and when it overruled mother's amended objections related to contempt by order dated June 25, 2024.

{¶ 75} Finally, we have already noted that the standard of proof for criminal and civil contempt differ. In short, acts that constitute civil contempt may be proven by clear and convincing evidence. *Brown*, 64 Ohio St.2d at 252 (1980). To be punished for criminal contempt, by contrast, "the contemnor must be proven guilty beyond a reasonable doubt." *Goodman*, 2020-Ohio-2713, at ¶ 30 (8th Dist.). *See also Brown* at 252 ("[A] contemnor cannot be given a criminal contempt sanction unless proven guilty beyond a reasonable doubt."); *Bright*, 2020-Ohio-5180, at ¶ 23 (8th Dist.); *In re Mallory-Nichols*, 2023-Ohio-3982, at ¶ 17 (8th Dist.). In *In re Mallory-Nichols*, we cited with approval an Eleventh District opinion that held that "because the juvenile court *made no finding of guilt beyond a reasonable doubt*, and did not address the element of intent, the court erred in finding the employee in indirect criminal contempt." (Emphasis added.) *Id.* at ¶ 26, citing *In re D.S.S.*, 2020-Ohio-5386, ¶ 20 (11th Dist.). We found that "[s]imilarly, the juvenile court in this matter did not find that Mallory-Nichols was guilty beyond a reasonable doubt." *In re Mallory-Nichols* at ¶ 27.

{¶ 76} Here, as in *In re D.S.S.* and *In re Mallory-Nichols*, the juvenile court did not specify that it found mother guilty of contempt beyond a reasonable doubt.

We recognize that we have previously held that "[w]here there is no indication that any other standard was employed by the trial court, a finding of contempt may properly be upheld." *In re Contempt of Warner*, 2004-Ohio-2389, ¶ 12 (8th Dist.), citing *In re Gonzalez*, 70 Ohio App.3d 752, 756 (8th Dist. 1990). Here, however, we are troubled that neither the magistrate nor the juvenile court referenced the appropriate standard of proof — particularly in light of the other irregularities in these contempt proceedings, such as the erroneous designation as direct contempt and the fact that the contempt proceedings evolved from civil contempt with purge conditions to an unconditional jail sentence without additional due-process protections.[10] Absent a statement of the standard of proof, and given the importance of appropriate due process prior to an unconditional deprivation of liberty, we will not assume that the magistrate and juvenile court applied the correct standard of proof.

---

[10] Here, the magistrate sentenced mother to 30 days' imprisonment, with three days credit for time served, and ordered mother (already in custody) remanded. The magistrate, however, lacked jurisdiction to independently impose a criminal sanction for indirect contempt. Without the special grant of jurisdiction to punish actions in contempt that are directly observed by the magistrate, "only judges, not magistrates, may terminate claims or actions by entering judgment." *In re Guardianship of Dougherty*, 2013-Ohio-2841, ¶ 5 (11th Dist.), citing *Wheeler v. Tubbs*, 2008-Ohio-6411, ¶ 7 (11th Dist.). Juv.R. 40(C)(2)(f) specifically limits a magistrate's independent ability to impose a contempt sanction for acts of direct contempt that occur in the presence of the magistrate. We have already determined that the acts set forth in the magistrate's April 26 decision are acts of indirect contempt that occurred outside of the magistrate's immediate presence. Therefore, that order could not properly be issued pursuant to Juv.R. 40(C)(2)(f) or R.C. 2705.01. The magistrate lacked authority to independently impose a sanction that was immediately effective. The magistrate acted outside of the limited jurisdiction provided to magistrates under Juv.R. 40 and the ability to impose summary contempt sanctions under R.C. 2705.01. Because the juvenile court ultimately adopted the magistrate's orders, however, and because this issue is not dispositive of the appeal, we decline to address it further.

{¶ 77} For the reasons above, we find merit to mother's first assignment of error. The juvenile court's judgment of contempt is reversed, and the sentence to an unconditional term of confinement is vacated.

**B. Second Assignment of Error — Contempt — Manifest Weight**

{¶ 78} In her second assignment of error, mother argues that the juvenile court's decisions, orders, and actions pertaining to contempt were against the manifest weight of the evidence. This assignment of error is rendered moot by our disposition of mother's first assignment of error. App.R. 12(A)(1)(c).

**C. Third Assignment of Error — Neglect**

{¶ 79} In her third assignment of error, mother contends that the trial court abused its discretion and violated her due-process rights by adjudicating E.V. as neglected and that the adjudication of neglect was against the manifest weight of the evidence. We find no merit to this assignment of error.

{¶ 80} Pursuant to R.C. 2151.03, the juvenile court has the statutory authority "to hear complaints alleging that a child is abused, neglected, or dependent." *In re E.B.*, 2020-Ohio-4139, ¶ 44 (8th Dist.). The juvenile court "must base its adjudication on the evidence adduced at the adjudicatory hearing to support the allegations in the complaint." *Id.*, citing *In re Hunt*, 46 Ohio St.2d 378, 380 (1976).

{¶ 81} Relevant to these proceedings, R.C. 2151.03(A)(3) provides:

(A) As used in this chapter, "neglected child" includes any child:

. . .

(3) Whose parents, guardian, or custodian neglects the child or refuses to provide proper or necessary subsistence, education, medical or surgical care or treatment, or other care necessary for the child's health, morals, or well being[.]

R.C. 2151.03(A)(3).

{¶ 82} The applicable evidentiary standard for adjudicating a child as neglected is clear and convincing evidence. R.C. 2151.35(A); *In re E.B.* at ¶ 45. The Ohio Supreme Court has stated:

> "Clear and convincing evidence is that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established."

*In re Z.C.*, 2023-Ohio-4703, ¶ 7 (8th Dist.), quoting *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus. *See also In re E.B.* at ¶ 46. In *Cross*, the Ohio Supreme Court further clarified that clear and convincing evidence "does not mean clear and *unequivocal.*" (Emphasis in original.) *Id.* at 477, citing *Merrick v. Ditzler*, 91 Ohio St. 256 (1915).

{¶ 83} With respect to the standard of review we apply in this context, we recently stated:

> "When an appellate court examines whether a trial court's judgment is based upon clear and convincing evidence, 'a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof.'" *In re C.O.*, 8th Dist. Cuyahoga Nos. 99334 and 99335, 2013-Ohio-5239, ¶ 30, quoting *State v. Schiebel*, 55 Ohio St.3d 71, 74, 564 N.E.2d 54 (1990). If the trial court's judgment is "supported by some competent, credible evidence going to all the essential elements of the case," a reviewing court may not reverse that judgment. *Schiebel* at 74. Furthermore, "an appellate court should not substitute its judgment for that of the trial court when there exists competent and credible

evidence supporting the findings of fact and conclusion of law." *Id.* Moreover, deferring to the trial court on matters of credibility is "crucial" in cases involving children, "where there may be much evident in the parties' demeanor and attitude that does not translate to the record well." *Davis v. Flickinger*, 77 Ohio St.3d 415, 418, 674 N.E.2d 1159 (1997).

*In re E.B.*, 2020-Ohio-4139, at ¶ 47 (8th Dist.).

**{¶ 84}** With respect to manifest-weight challenges, we have written:

"When evaluating a claim that a judgment was contrary to the manifest weight of the evidence, [an appellate court] must review the record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered."

*In re G.T.*, 2022-Ohio-1406, ¶ 25 (8th Dist.), quoting *In re Z.H.*, 2015-Ohio-3209, ¶ 10 (1st Dist.). Consistent with *In re E.B.*, however, we reiterated that in cases involving children, an "appellate court should defer to the juvenile court's credibility determinations[.]" *In re G.T.* at ¶ 25, citing *C.O.* at ¶ 30.

**{¶ 85}** Finally, a trial court "abuses its discretion when it exercises its judgment in an unwarranted way with respect to a matter over which it has discretionary authority." *Hunter v. Troutman*, 2025-Ohio-366, ¶ 64 (8th Dist.), citing *Johnson v. Abdullah*, 2021-Ohio-3304, ¶ 35. "The term abuse of discretion implies that the court's attitude is unreasonable, arbitrary, or unconscionable." *Hunter* at ¶ 64, citing *Blakemore v. Blakemore*, 5 Ohio St.3d 217 (1983). Where the trial court record "contains competent, credible evidence to support the trial court's decision," there is no abuse of discretion. *Hunter* at ¶ 64, citing *Trolli v. Trolli*, 2015-Ohio-4487, ¶ 29 (8th Dist.). We are not permitted to substitute our judgment for

the judgment of the trial court. *Hunter* at ¶ 64, citing *Vannucci v. Schneider*, 2018-Ohio-1294, ¶ 22 (8th Dist.).

**{¶ 86}** With these standards in mind, we turn to mother's third assignment of error. As used in R.C. 2151.03(A)(2), "adequate parental care" means "the provision by a child's parent or parents, guardian, or custodian of adequate food, clothing, and shelter to ensure the child's health and physical safety and the provision by a child's parent or parents of specialized services warranted by the child's physical or mental needs." R.C. 2151.011(B)(1); *In re E.E.*, 2021-Ohio-2770, ¶ 40 (8th Dist.); *In re C.S.*, 2012-Ohio-2884, ¶ 14 (9th Dist.).

**{¶ 87}** The transcript of the adjudicatory hearing supports the juvenile court's ruling that E.V. was a neglected child. As the juvenile court summarized in the extensive findings issued June 25, 2024, E.V. was chronically truant from school. The transcript reflects that while he was enrolled in the Berea schools at the beginning of the 2023-2024 school year, he was chronically absent and failing all of his classes. He was thereafter enrolled in North Olmsted High School but attended only one day. On that very day, he was suspended for refusing to hand over a vape pen. The school called mother to pick him up, but she failed to do so. When the school resource officer drove E.V. home that day, they asked to speak to mother, but she did not come to the door.

**{¶ 88}** E.V. was ultimately expelled. The North Olmsted schools had scheduled a virtual expulsion hearing, but neither mother nor E.V. participated. The transcript also reflects that mother could have taken steps to mitigate the expulsion,

allowing E.V. to return to school sooner, but she failed to do so. The record reflects that mother also ignored the agency's early attempts to intervene and gain her cooperation in addressing E.V.'s educational needs after his expulsion.

{¶ 89} Mother's argument that E.V.'s truancy was insufficient to support a finding of neglect misses the mark. She relies principally on the Ninth District case of *In re M. O.*, 2010-Ohio-5107 (9th Dist.), in which the court, pointing to the comprehensive legislative scheme enacted to address truancy issues, held that truancy alone does not establish neglect or dependency.

{¶ 90} Not only is *In re M. O.* not binding precedent, it is also distinguishable. In that case, the Summit County Children Services Board ("CSB") "offered no evidence of any of the circumstances surrounding the school absences, including . . . *whether Mother was aware at the time that they were not attending school.*" (Emphasis added.) *Id.* at ¶ 13. In addition, the Ninth District's summary of testimony regarding CSB's attempts to work with the mother to address school attendance issues was vague at best. The Ninth District wrote that "[t]he caseworker testified that she did not have the opportunity to discuss the children's school attendance with Mother." *Id.* The opinion is unclear whether any missed opportunities were the result of CSB's lack of efforts to engage with the mother on this issue or — as in the present case — mother's unreceptiveness to agency outreach and her unwillingness to work with the agency or the school system to address her child's educational needs.

{¶ 91} With those factual distinctions in mind, even if we were to accept the Ninth District's core proposition of law, the present case more closely aligns with this court's own decision in *In re A.S.*, 2018-Ohio-1085 (8th Dist.). In that case, the child had over 100 unexcused absences, and the mother had "fail[ed] to respond to the agency's concerns relative to A.S.'s educational needs." *Id.* at ¶ 2. This court held that the juvenile court could properly find neglect and award temporary custody "based on [mother's] demonstrated inability to meet A.S.'s educational needs, *as well as her ongoing lack of engagement and cooperation with the agency and other services.*" (Emphasis added.) *Id.* at ¶ 20. Here, as in *In re A.S.*, E.V.'s truancy is only part of the issue. As the agency points out, this is not just a matter involving a child refusing to attend school, and mother's obligations to attend to his educational needs do not end when she takes him to school. Not only had E.V. attended at most two days of school by the time the agency filed the complaint in February 2024, but mother had ignored or rebuffed the agency's and North Olmsted school district's efforts to work with her to resolve E.V.'s educational issues. When E.V. faced expulsion, mother failed to attend the virtual hearing set up by the school district. She refused to engage with a caseworker to address E.V.'s attendance issues. She rejected the early intervention FIRST program. This is more than a truancy case involving an unruly child. The evidence supports the juvenile court's finding of neglect.

{¶ 92} We further reject mother's due-process argument that the juvenile court was required to dismiss the complaint because it did not hold the adjudicatory hearing within the time specified by R.C. 2151.28(A)(2). The statute provides:

> If the complaint alleged that the child is an abused, neglected, or dependent child, the adjudicatory hearing shall be held no later than thirty days after the complaint is filed, except that, for good cause shown, the court may continue the adjudicatory hearing for either of the following periods of time:
>
> (a) For ten days beyond the thirty-day deadline to allow any party to obtain counsel;
>
> (b) For a reasonable period of time beyond the thirty-day deadline to obtain service on all parties or any necessary evaluation, except that the adjudicatory hearing shall not be held later than sixty days after the date on which the complaint was filed.

R.C. 2151.28(A)(2).

{¶ 93} Another subsection of the same provision, however, disposes of mother's argument. It provides, in pertinent part:

> The failure of the court to hold an adjudicatory hearing within any time period set forth in division (A)(2) of this section does not affect the ability of the court to issue any order under this chapter and does not provide any basis for attacking the jurisdiction of the court or the validity of any order of the court.

R.C. 2151.28(K). Citing subsection (K), we have previously held that "[t]he timeframes for the adjudicatory hearing are not jurisdictional[.]" *In re J.S.*, 2022-Ohio-1679, ¶ 14 (8th Dist.). This reading of the statute is further supported by Ohio Supreme Court precedent. The Court specifically cited R.C. 2151.28(K) as an instance where "the legislature has expressly provided that a juvenile court can act beyond a designated time limit." *In re K.M.*, 2020-Ohio-995, ¶ 24. The Ohio

Supreme Court acknowledged the time limits and exceptions listed in R.C. 2151.28(A)(2), but stated that "the General Assembly has also specified that the court's failure to hold an adjudicatory hearing within those time periods 'does not affect the ability of the court to issue any order under this chapter and does not provide any basis for attacking the jurisdiction of the court or the validity of any order of the court.'" *Id.*, quoting R.C. 2151.28(K).[11]

{¶ 94} Upon review of the entire record in light of the standard of proof — clear and convincing evidence — we find that ample competent, credible evidence supports the juvenile court's determination that E.V. was a neglected child. We find no abuse of discretion, and we find that the juvenile court's adjudication was not against the manifest weight of the evidence. We further find that mother was not denied due process. Mother's third assignment of error is overruled.

### D. Fourth Assignment of Error — Temporary Custody to CCDCFS

{¶ 95} In her fourth and final assignment of error, mother contends that the trial court abused its discretion, violated her due-process rights, and went against the manifest weight of the evidence as to the disposition of temporary custody to the agency. We find no merit to this assignment of error.

{¶ 96} "If a child has been adjudicated neglected or dependent, the juvenile court may order the child placed in the temporary custody of CCDCFS if it finds

---

[11] We, along with other courts, have recognized that *In re K.M.*, has been superseded by statute with respect to the 90-day limit in which to hold the dispositional hearing. *See, e.g., In re J.S.* at ¶ 19. The referenced amendment, however, has no effect on the timing of adjudicatory hearings or R.C. 2151.28(K).

such a disposition to be in the best interest of the child based on a preponderance of the evidence." *In re Q.S.*, 2023-Ohio-712, ¶ 116 (8th Dist.), citing R.C. 2151.353(A)(2)(a). *See also In re K.E.*, 2022-Ohio-3333, ¶ 22 (8th Dist.); *In re A.S.*, 2018-Ohio-1085, at ¶ 18 (8th Dist.). Preponderance of the evidence is "'evidence that is more probable, more persuasive, or of greater probative value.'" *In re C.V.M.*, 2012-Ohio-5514, ¶ 7 (8th Dist.), quoting *In re D.P.*, 2005-Ohio-5097, ¶ 52 (10th Dist.). *See also In re A.S.* at ¶ 18.

{¶ 97} With respect to the various disposition options under the statute, we have held that "'[a]n award of temporary custody to a public or private children's services agency is substantially different from an award of permanent custody, where parental rights are terminated.'" *In re G.G.*, 2022-Ohio-3821, ¶ 47 (8th Dist.), quoting *In re Ka.C.*, 2015-Ohio-1158, ¶ 20 (8th Dist.). This is because "'the parent only loses temporary custody of a child and retains residual parental rights, privileges, and responsibilities.'" *In re G.G.* at ¶ 47, quoting *In re Ka.C.* at ¶ 20, citing *In re G.M.*, 2011-Ohio-4090, ¶ 14 (8th Dist.). In this context, "[t]he parents may regain custody; it is not permanently foreclosed." *In re G.G.* at ¶ 47, citing *In re Ka.C.* at ¶ 20, citing *In re M.J.M.*, 2010-Ohio-1674, ¶ 12 (8th Dist.). It is the possibility of reunification that underpins the juvenile court's application of the less stringent "preponderance of the evidence" standard in temporary custody cases. *In re G.G.* at ¶ 48, citing *In re Ka.C.* at ¶ 20, citing *In re M.J.M.* at ¶ 9; *see also In re Q.S.* at ¶ 118.

{¶ 98} We review the juvenile court's decision for abuse of discretion:

When reviewing a juvenile court's judgment in child custody cases, the Supreme Court of Ohio has stated that the "court's decision in a custody proceeding is subject to reversal only upon a showing of abuse of discretion." *In re A.J.*, 148 Ohio St.3d 218, 2016-Ohio-8196, 69 N.E.3d 733, ¶ 27, citing *Davis v. Flickinger*, 77 Ohio St.3d 415, 417, 674 N.E.2d 1159 (1997).

*In re G.G.* at ¶ 46.

{¶ 99} We have emphasized that "in choosing among the alternative dispositions authorized by R.C. 2151.353(A), the court's primary concern remains the best interest of the child." *In re G.G.* at ¶ 45, citing *In re Ka.C.* at ¶ 19. In that regard, "'[a] trial court has substantial discretion in weighing the considerations involved in making the determination regarding a child's best interest[.]'" *In re G.G.* at ¶ 45, quoting *In re S.M.*, 2011-Ohio-6710, ¶ 4 (2d Dist.), citing *In re K.H.*, 2010-Ohio-1609, ¶ 66 (2d Dist.). Furthermore, "[t]here is no specific test or set of criteria that must be applied to determine what is in a child's best interest when considering temporary custody as a dispositional alternative following an adjudication of abuse, neglect or dependency." *In re Q.S.*, 2023-Ohio-712, at ¶ 119 (8th Dist.).

{¶ 100} Upon review of the complete record, we find and conclude that the juvenile court's decision to award temporary custody to CCDCFS was supported by the preponderance of the evidence and was not against the manifest weight of the evidence, and that the juvenile court did not abuse its discretion in determining that it was in E.V.'s best interest to grant temporary custody of him to the agency.

{¶ 101} Ample competent, credible evidence in the record supports the juvenile court's decision. Mother failed to cooperate with North Olmsted school

when E.V. faced expulsion. She did not come to the school on the day of the vape-pen incident, despite being requested to do so. She did not meet the officer at the door when he took E.V. home that day. She failed to attend the virtual meeting with the school district with respect to the sanction of expulsion. She failed to take steps to mitigate the expulsion, i.e., to satisfy certain conditions that would have allowed E.V. to reenroll sooner. Mother rebuffed the agency's efforts to address the situation prior to the filing of the complaint. As Deininger testified, "[M]om has been evasive." (Disposition/Contempt tr. 21.)

{¶ 102} Mother argues that the agency should have done more to assist E.V. once the juvenile court granted emergency temporary custody to CCDCFS in February 2024. That argument, however, ignores the distinction between the *grant* of emergency custody and *actual* custody. There is no dispute that the agency did not have physical custody of E.V. until April 25, 2024, the day of the adjudicatory and dispositional hearing. The testimony, including that of the GAL, was consistent in that the agency had been unable to have a meaningful conversation with E.V. and develop an appropriate case plan. While the GAL acknowledged that he had insufficient information to opine on E.V.'s best interests due to his inability to meet with E.V., he recommended agency involvement. (Disposition/Contempt tr. 34-35.)

{¶ 103} Moreover, despite our reversal of the criminal-contempt sanction, we reject any suggestion that for purposes of temporary custody we are required to ignore the findings of fact made by the magistrate and adopted by the juvenile court with respect to mother's role in secreting E.V. from the agency. The juvenile court

found that mother was, at the very least, complicit in E.V.'s AWOL status. That finding is supported by a preponderance of the evidence. In light of that, temporary custody to the agency advances not only the goal of developing an appropriate case plan, but also ensuring E.V. is available to the agency to facilitate its implementation. (Disposition/Contempt tr. 30-31.) We further note that the permanency plan for E.V. explicitly continues to be reunification. In short, mother has not permanently lost custody of E.V.

{¶ 104} We reject mother's due-process arguments. First, mother challenges the juvenile court's refusal to grant her belated attempt to continue the dispositional hearing to another date. Mother's new counsel made this request on the day of trial, even though mother's previous counsel had consented to the scheduling of both the adjudicatory and dispositional hearings on the same day. Moreover, notices of the adjudicatory and dispositional hearing date were sent in multiple entries beginning on March 8, 2024, and there is nothing in the record indicating mother's new counsel filed a motion for continuance. As we recently wrote:

> [I]t is clear that there was a definite bifurcation of the proceedings, as well as consent by Mother to hold the hearings on the same day. Mother was aware, prior to the hearing, of the court's intent to address both adjudication and disposition on the same day . . . . Additionally, Mother was given an opportunity to present witnesses and any other evidence regarding disposition. Thus, "even if we found any error (which we do not), the error would have harmless." *In re R.R.*[, 2014-Ohio-5579, ¶ 54 (2d Dist.)].

*In re J.S.*, 2024-Ohio-3310, ¶ 35 (8th Dist.).

{¶ 105} Second, mother argues that the dispositional hearing was untimely under R.C. 2151.35(B)(1), which states in pertinent part that "[t]he dispositional hearing shall not be held more than ninety days after the date on which the complaint in the case was filed," with an extension permitted for good cause. *Id.* Mother's counsel argued at the dispositional hearing: "I'm going to object to disposition, your Honor, on the record because it's past the date in which it should have occurred and it's a violation of my client's due process right[.]" (Disposition/Contempt tr. 7-8.) The complaint was filed February 5, 2024. The dispositional hearing was held April 25, 2024. That date was 80 days after the filing of the complaint. Mother's fourth assignment of error is overruled.

{¶ 106} In accordance with our resolution of mother's first assignment of error, the juvenile court's judgment of contempt is reversed, and the sentence to an unconditional term of confinement is vacated. In all other respects, the juvenile court's judgments are affirmed. This case is remanded to the trial court for further proceedings consistent with this opinion.

It is ordered that appellant and appellee share the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court, juvenile division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
DEENA R. CALABRESE, JUDGE

MARY J. BOYLE, P.J., and
KATHLEEN ANN KEOUGH, J., CONCUR